**GENERAL CONSTRUCTION COMPANY, Appellant,**

v.

**TYONEK TIMBER, INC., Appellee.**

**No. 5175.**

Supreme Court of Alaska.

June 19, 1981.

Dennis L. McCarty, Ellis Law Offices, Ketchikan, and Arthur B. McGarry, Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, for appellant.

Phyllis C. Johnson, John M. Conway, Atkinson, Conway, Bell & Gagnon, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BURKE and MATTHEWS, JJ., and STEWART, Superior Court Judge.

## OPINION

MATTHEWS, Justice.

On May 20, 1974, Kodiak Lumber Mills, Inc. (KLM) contracted with General Construction Co. for the construction of a deep water dock at Tyonek to be used for loading ships with wood products obtained from the surrounding area. The work on the dock began a few months thereafter. At the same time Tyonek Timber, Inc. was in the process of building a chip mill for KLM near the dock area.

A dispute arose between General and KLM concerning whose responsibility it was under the dock construction contract to haul material to the dock area to protect the dock pilings from the effects of tidal currents. While this dispute remained unresolved, Tyonek entered into an oral agreement with General to transport the material at the price of $9.00 per yard.

After the oral agreement was reached Tyonek moved the material to the dock area and General placed it around the pilings. Tyonek submitted a bill to General for this service and, when the bill went unpaid, filed suit against General. At the trial, there was no dispute as to the amount of material which Tyonek had hauled. General, however, contended that under the terms of the oral contract Tyonek was to transport the material to the site and place it around the dock pilings. Therefore, General claimed that Tyonek had not substantially performed its contract. In addition, General argued that Tyonek could not recover upon a theory of unjust enrichment because General had not been unjustly enriched since General's obligation under the prime contract with KLM did not cover hauling the material to the site. General suggested therefore that any recovery to Tyonek for unjust enrichment should be sought from KLM, not General.

The case was tried to the court sitting without a jury. The court found that the agreement between Tyonek and General only included hauling the material to the site, not placing it next to the dock pilings. The court went on to examine the terms of the contract between KLM and General, stating:

> The question central to a decision in this case is, what was the intent of the parties regarding the scour protection fill? If, as it contends, General was under no contractual obligation to haul the fill, then it appears that Tyonek Timber has no claim against General for hauling what the owner was bound to furnish. If, on the other hand, General was obligated under the contract to furnish and place the fill, then Tyonek Timber is entitled to the agreed on price for furnishing the material.

The court then concluded that as between General and KLM, General was required to haul the material. The court directed entry of judgment in favor of Tyonek against General in the sum of $48,150.00 plus costs and attorney's fees.

On appeal General argues that the trial court erred in two respects:

(1) In holding that General was bound under the contract with KLM to haul the scour protection material to the project site, and

(2) in holding that KLM did not breach an implied warranty that adequate scour protection material would be available at the gravel pit at the site.

General does not challenge the finding of the trial court that Tyonek was not obligated to place the material next to the pilings under the terms of the oral agreement with Tyonek. That finding therefore stands and, in our view, is dispositive of the case.

The conclusions of the court concerning the terms of the contract between KLM and General are not germane to the present case unless Tyonek's status as a corporation separate from KLM is to be disregarded, or unless Tyonek was acting as an agent for KLM in making the oral contract. General argues that the court must have accepted one of these theories. For the following reasons we believe that neither theory could have been appropriately applied to this case.

The trial court did not expressly conclude that Tyonek and KLM should be considered as one entity. Moreover, the court made no findings of fact which would support such a conclusion. Further, the question of whether Tyonek and KLM should be regarded as the same entity was not presented to the trial court either by the pleadings, or the briefs and arguments of counsel.

The evidence presented at the trial which would have been relevant to the issue would not have justified treating Tyonek and KLM as the same corporation. In *Jackson v. General Electric Company*, 514 P.2d 1170 (Alaska 1973) we noted that the corporate status of a subsidiary can be disregarded

> when the parent uses a separate corporate form to defeat public convenience, justify wrong, commit fraud, or defend crime. The parent corporation may also be liable for the wrongful conduct of its subsidiary when the subsidiary is the mere instrumentality of the parent. Liability is imposed in such instances simply because the two corporations are so closely intertwined that they do not merit treatment as separate entities. [Footnotes omitted]

*Id.* at 1172–73. We noted 11 factors which may be relevant in ascertaining whether a subsidiary is acting as the mere instrumentality of its parent:

> (a) The parent corporation owns all or most of the capital stock of the subsidiary.
>
> (b) The parent and subsidiary corporations have common directors or officers.
>
> (c) The parent corporation finances the subsidiary.
>
> (d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.
>
> (e) The subsidiary has grossly inadequate capital.
>
> (f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.
>
> (g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

> (h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.
>
> (i) The parent corporation uses the property of the subsidiary as its own.
>
> (j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.
>
> (k) The formal legal requirements of the subsidiary are not observed.

*Id.* at 1173. We stated concerning these factors that it is not necessary that all of them be found in order to conclude that the subsidiary's separate status should be ignored. "A parent corporation which does not permit its subsidiary to exercise an individual status may not expect that the subsidiary's independence will be recognized elsewhere." 514 P.2d at 1173.

In *Bendix Corp. v. Adams*, 610 P.2d 24, 32 (Alaska 1980), we alluded to the factors listed in *Jackson*, but found them to be of secondary importance, stating:

> [M]ore important than the quantitative approach ... is the fact that there is no suggestion anywhere in the record that [the subsidiary] was created to "defeat public convenience, justify wrong, commit fraud, or defend crime."

■ Here, as in *Bendix*, no contention is made that KLM used Tyonek to defeat public policy or perpetrate a wrong or fraud or crime. Moreover, under the quantitative approach suggested in *Jackson*, there is an insufficient showing of interrelatedness. All we are told is that at the time in question 50% of Tyonek's stock was owned by KLM; Tyonek had a four person board of directors two of whom also served as directors of KLM; John Daly, a vice president of KLM, was also vice president of Tyonek; and KLM provided financing to Tyonek which Tyonek used to acquire vari-

ous pieces of equipment some of which were used to haul the material in question. On the other hand, 50% of Tyonek's stock was owned by Richard and Meredith Sykes, both of whom served as directors of Tyonek. Richard Sykes was president of Tyonek and neither Richard nor Meredith Sykes were officers, directors, or employees of KLM. There was no showing that KLM caused the incorporation of Tyonek; that Tyonek had grossly inadequate capital; that KLM paid the salaries, expenses or losses of Tyonek; that Tyonek had no business except with KLM, or no assets except those which were conveyed by KLM; that Tyonek was held out merely as a division of KLM; that KLM used Tyonek's property as its own; that Richard Sykes took orders from KLM; or that the formal legal requirements of Tyonek as a separate corporation were not observed. On this record, therefore, no conclusion that Tyonek should be treated as the same entity as KLM could be sustained.

▌General's contention that Tyonek was acting merely as an agent for KLM in making the oral contract with General is also unsupportable. To establish an agency relationship between Tyonek and KLM, General must show that Tyonek made the oral contract with it on behalf of KLM and not as a separate corporate entity.[1] The court did not expressly conclude that an agency existed, and made no findings of fact which would support such a conclusion. On the evidence presented, such a conclusion would have been clearly erroneous.

John Daly testified that Richard Sykes was not authorized to speak for KLM. There is no evidence that either Tyonek or KLM expressly or impliedly represented that Tyonek had the authority to act for KLM. The only evidence, apart from that concerning the interrelationships of the two corporations which we have discussed

above, which tends to indicate that Tyonek contracted as an agent of KLM rather than on its own behalf is a statement of John A. Beyer, president of General. He testified that at the meeting at which the oral contract was made "there was Red Bingham, Bill Epping and myself representing General, and John Daly, Cosby Steen and Dick Sykes representing Kodiak." This assertion, although relevant, was not explained, and was undercut by other assertions of Beyer. He stated that there often were disputes between Sykes and the people working for General Construction which "caused a kind of unhappy feeling between him and our employees and we frankly never were understanding about what his position was in the matter anyway." Further, Beyer acknowledged that the oral contract for hauling material was not between General and KLM but between General and "a third party."[2] The testimony of William H. Epping, another officer of General who was present at the same meeting, supports the view that General understood that it was making a subcontract with Tyonek. Epping was asked and answered as follows:

Q. So it was your clear impression as a result of that discussion that, in essence, what had happened was that the aspect of that original contract between Kodiak Lumber Mill and General Construction to place scour protection was subcontracted to Tyonek Timber and that instead of you placing the scour protection for Kodiak Lumber, Tyonek Timber would do that aspect of the contract?

A. Correct.

In summary, the court's findings concerning the nature of the contract between KLM and General are irrelevant to this appeal because Tyonek and KLM were separate entities and Tyonek was not merely an agent of KLM in making the oral con-

---

1. A subsidiary is not presumed to be the agent of its parent corporation. *Bendix Corp. v. Adams*, 610 P.2d 24, 33 (Alaska 1980).

2. Beyer was asked and answered as follows:
   Q. Now the initial contract was between you and Kodiak Lumber Mill; is that correct?
   A. Correct.

   Q. Was there any problem with delegating that work to a third party?
   A. No, there was not because John Daly was right there when the agreement was made and John Daly looked to Dick Sykes for advice constantly and pretty much whatever Dick said John Daly did, so I didn't think there was any particular problem in that regard.

tract with General on which this lawsuit was based. Tyonek has performed its obligations under the oral contract and it is entitled to be compensated for its performance.

The judgment is AFFIRMED.