UCHITEL COMPANY; R. J. Gould, individually; Visions, Ltd.; Robert N. Uchitel, individually, Appellants,

v.

The TELEPHONE COMPANY, an Alaska Corporation, Appellee.

No. 5687.

Supreme Court of Alaska.

June 18, 1982.

Andrew E. Hoge, Warren G. Kellicut, Hoge & Lekisch, Anchorage, for appellants.

Brian R. Shute and Peggy A. Roston, Anchorage, for appellee.

Before BURKE, C. J., and RABINOWITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal finds its origin in appellants' alleged breach of a contract which required the appellee to manufacture and install an office telephone system.[1]

### I. *Facts*

In February 1978, Robert Uchitel contacted The Telephone Company (TTC) concerning development of a new office phone system primarily for Visions. Rodger Davis, sales representative for TTC, then met with Robert Uchitel to discuss the phone system. As a result of this meeting TTC worked up a proposal, dated March 8, 1978, designed to meet Uchitel's specifications. Uchitel then advised that if certain modifications could be made, he thought they could "do business." Thereafter TTC developed a second proposal which it presented to Uchitel at a meeting on March 16, 1978. TTC claims that at this time Uchitel approved this proposal and advised Davis to order the equipment and to prepare the necessary documents.[2]

In the week following this meeting, Davis and John Alden, president and general

---

1. Appellee TTC is a private telephone company which designs, sells, and leases telephone equipment. Appellants are Visions, Ltd. (Visions), a corporation involved in pay television and electronic communications, Uchitel Company (Uchitel Co.), a company engaged in general contracting, Robert N. Uchitel, sole owner of Uchitel Co. and part owner, chairman of the board and chief executive officer of Visions, and R. J. Gould, managing officer of Visions.

The superior court did not enter judgment against Gould, finding that Gould merely acted as an authorized agent of Visions, Uchitel Co.,

and Uchitel individually. Gould filed a motion for costs and attorney's fees as the prevailing party. The superior court denied the motion and Gould has appealed this ruling.

2. Robert Uchitel admits that at this March 16 meeting he directed Davis to order the phone equipment. Appellants contend, however, that they never finalized any agreement as to the purchase or lease of the phone system. Uchitel testified that he intended Davis to order the equipment so that when (and if) they finally reached an agreement all the necessary materials would be quickly available. He further

manager of TTC, drafted a property lease agreement and a letter of understanding containing an option to purchase which formed the basis of the alleged contract. TTC then began ordering equipment, designing the system, and constructing some component parts.[3]

On March 21, 1978, Davis returned to Uchitel's office with the lease, the letter of understanding and several other documents. At this meeting Uchitel reviewed the documents, made certain modifications, and signed the letter containing the option agreement. He then requested Davis to see Gould, the managing officer of Visions, in order to settle the remaining paper work. The documents were subsequently executed by Gould.[4]

According to Davis's testimony, approximately one week later, on March 30, Uchitel advised that he was encountering some difficulties on another project and that the installation of the TTC phone system would have to be placed on hold for a while. Uchitel's version of this conversation is that he advised Davis that he did not intend to accept the equipment and that he would be

willing to pay whatever costs had been incurred by TTC in the ordering and shipment of the equipment.

After several unsatisfactory discussions with Uchitel, on April 27, 1978 TTC sent a letter to Uchitel demanding payment of the deposit and the furnishing of the necessary corporate resolutions. Uchitel testified that as far as he was concerned he had cancelled his order for the equipment on March 30, and that these later discussions were merely to determine the expenses which TTC had incurred in ordering and stocking the equipment. Following another futile effort at resolving these differences TTC, on August 28, 1978, filed an action in the superior court for breach of contract.[5] After a nonjury trial the superior court entered judgment against Robert Uchitel, Uchitel Co., and Visions in the amount of $85,987.37.[6] This appeal followed.

II. *Did the superior court err in finding a contract between TTC and Robert Uchitel, Uchitel Company, and Visions, Ltd.?*

■ The superior court found that TTC and Uchitel Co., Visions, and Uchitel

---

stated that he believed that his only obligation at that point was to pay for the shipping and storage costs if no agreement was reached and the equipment had to be returned.

3. Although the phone system was designed primarily for Visions, the documents were prepared in Uchitel Co.'s name. TTC preferred to finance its leases rather than to carry them. The lease was to be assigned to a bank which would loan TTC up to the net cash value of the contract. In view of the fact that Visions was a relatively new company, with a correspondingly short credit history, TTC thought it best to have Uchitel Co. on the document as the contracting party since it was an established concern with a solid credit rating.

4. Davis testified that Gould told him that the deposit for the lease would have to come from the Uchitel Co. bookkeeper and that the check and a Visions corporate resolution would be completed in a few days. Davis returned to TTC with the signed documents and TTC claims it continued to work on the phone system. Alden subsequently executed the lease agreement but for some reason failed to sign the letter of understanding.

5. Subsequent to filing of this action TTC entered a contract, dated September 29, 1978, to

construct and install a telephone system for Arctic Slope/Alaska General (ASAG). Alden testified that instead of returning all of the equipment rejected by Uchitel to the manufacturer, he decided to incorporate some of these components into the system which ASAG agreed to purchase. According to Alden, in order to make this used equipment acceptable to ASAG, TTC was forced to offer a discount on the contract price. The cash price specified in the resale contract was $38,940.00. Although TTC claims it was forced to discount the contract price because of the recycled equipment, the contract merely states that a discount was available if the total contract price ($43,267.00) was paid in full within 15 days of cut over date.

6. Appellants filed numerous post trial motions for relief: Motion for New Trial, alternatively, Motion to Reopen Testimony and Motion to Amend Findings and Conclusions; Motion to Amend Findings of Fact and Judgment; Motion for Relief of Judgment Under Civil Rule 60(b); Motion for Judgment, Costs and Attorney Fees on behalf of R. J. Gould. All of the foregoing motions were denied.

entered into an oral contract on March 15, 1978; that the terms and conditions of this contract were embodied in the written lease agreement and the letter of understanding containing the option to purchase; that the contract between the parties was not conditioned in any way upon TTC's ability to finance the lease; and that appellants failed to establish a statute of frauds defense since the contract was set down in a writing signed by appellants and TTC had substantially performed its contractual obligations prior to appellants' breach.

We have previously held that "[w]here the existence of an oral contract and the terms thereof are the points in issue and the evidence is conflicting, it is for the trier of the facts to determine whether the contract did in fact exist, and if so, the terms thereof."[7] Under Civil Rule 52(a) the superior court's findings are binding upon this court unless they are clearly erroneous.[8] After review of the conflicting evidence in this case, and guided by Civil Rule 52(a) and the rule that requires an appellate court to take the view of the evidence most favorable to the prevailing party at trial, we hold that none of the aforementioned findings of the superior court concerning the existence and terms of the contract between the parties are clearly erroneous.[9]

III. *Did the superior court err in determining that Uchitel Co. and Robert Uchitel, individually, were liable on the subject contract?*

■ Appellants contend the superior court erred in determining that Uchitel Co.

and Robert Uchitel were parties to the contract with TTC. They claim that Uchitel Co. was not a party to the alleged contract, arguing the evidence shows that the phone system was intended primarily for Visions, and not for Uchitel Co., whose involvement was solely to facilitate financing.

TTC argues that it was always intended that Uchitel Co. be a party to the lease. TTC contends the following facts establish Uchitel Co.'s liability: Uchitel Co.'s name appears on both the lease and the option agreement; Robert Uchitel, sole owner of Uchitel Co., initiated contact with TTC and conducted the negotiations for the phone system with Davis; Uchitel signed the option agreement and directed Gould to sign the lease. In addition, TTC claims that Uchitel represented to Davis that he wanted the phone system primarily for Visions, but also for Uchitel Co. Furthermore, Uchitel admitted that parts of the system would be installed in Uchitel Co.'s offices.

Based on the foregoing, we hold that the superior court did not err in concluding that Uchitel Co. was a party to the contract in question.[10]

■ The superior court found that Robert Uchitel was the principal operative and "alter ego" of Visions and Uchitel Co. and that he led TTC to believe that he was personally liable on the contract. Appellants argue that there is no evidence in the record which would support a finding of individual liability on the part of Robert Uchitel.[11] Our review of the record fails to

7. *Jackson v. White*, 556 P.2d 530, 532 (Alaska 1976).

8. Alaska R.Civ.P. 52(a) provides in relevant part:
   Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.
   A clearly erroneous finding is "one which leaves the supreme court with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding." *Frontier Saloon, Inc. v. Short*, 557 P.2d 779, 781–82 (Alaska 1976) (per curiam).

9. *See Geczy v. LaChappelle*, 636 P.2d 604, 606 (Alaska 1981).

10. Appellants' argument that Uchitel Co. was involved only to facilitate financing does not support their major premise that Uchitel Co. was not liable. We think it unreasonable that the parties could expect the bank to rely on the credit history of Uchitel Co. if the corporation was not liable under the lease which was to be assigned as security for the financing.

11. Appellants claim that in signing the option Uchitel was merely acting in his official capacity as a corporate officer not as an individual. They assert that Uchitel, as an authorized agent, could be found individually liable only if

disclose any evidence that Robert Uchitel represented to TTC that he would be personally liable on the contract. Thus, Robert Uchitel's individual liability should be affirmed only if the superior court was justified in piercing the corporate veil.

The evidence in this case indicates that Robert Uchitel was sole owner of Uchitel Co., part owner and chief executive of Visions, and that he exerted significant control over the day to day operations of these companies. TTC argues that Uchitel's dominant role in running the corporations justifies the superior court's imposition of personal liability. We have previously held, however, that mere control of a corporation's activities by an individual is insufficient to justify piercing the corporate veil:

> The corporate veil may not be pierced merely because Brown controls the activities of the corporation. Rather, the veil may be pierced only if the corporate form is used "to defeat public convenience, justify wrong, commit fraud, or defend crime." [12]

TTC failed to present any evidence from which it could be concluded that Uchitel deceived TTC or that he employed the corporate entities to defeat public policy or for some fraudulent or criminal purpose. Uchitel would therefore not be liable under the rule set out in *Elliott.*

In several cases involving the potential liability of a parent corporation for the conduct of its subsidiary we have held that the corporate status of the subsidiary can be disregarded when the subsidiary is a mere instrument of the parent.

> The parent corporation may also be liable for the wrongful conduct of its subsidiary when the subsidiary is the mere instrumentality of the parent. Liability is imposed in such instances simply because the two corporations are so closely intertwined that they do not merit treatment as separate entities.

*Jackson v. General Electric Co.,* 514 P.2d 1170, 1173 (Alaska 1973) (footnote omitted).[13] *See also General Construction Co. v. Tyonek Timber, Inc.,* 629 P.2d 981, 983 (Alaska 1981); *Volkswagenwerk, A.G. v. Klippan, GmbH,* 611 P.2d 498, 505 (Alaska), *cert. denied,* 449 U.S. 974, 101 S.Ct. 385, 66 L.Ed.2d 236 (1980). While this alternative theory of liability was developed in cases dealing with parent-subsidiary relationships

he designated himself as a party or if he was acting for an undisclosed principal. Restatement (Second) of Agency § 320 (1957). Further, appellants assert that Uchitel cannot be liable on the lease since he never executed it. Additionally, they contend that TTC understood throughout that it was dealing with Visions and Uchitel Co. as corporations, and that Robert Uchitel did not indicate in any manner that he was personally liable.

**12.** *Elliott v. Brown,* 569 P.2d 1323, 1326 (Alaska 1977), *quoting Jackson v. General Electric Co.,* 514 P.2d 1170, 1172–73 (Alaska 1973). *See also Bendix Corp. v. Adams,* 610 P.2d 24, 32 (Alaska 1980).

**13.** In *Jackson* we stated that the following criteria should be considered in determining whether the subsidiary should be treated as a mere instrument of the parent:

    (a) The parent corporation owns all or most of the capital stock of the subsidiary.

    (b) The parent and subsidiary corporations have common directors or officers.

    (c) The parent corporation finances the subsidiary.

    (d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

    (e) The subsidiary has grossly inadequate capital.

    (f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

    (g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

    (h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

    (i) The parent corporation uses the property of the subsidiary as its own.

    (j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

    (k) The formal legal requirements of the subsidiary are not observed.

*Jackson,* 514 P.2d at 1173.

we think that a similar analysis is applicable to the case at bar.[14]

In adapting the quantitative approach from the parent-subsidiary cases to the individual shareholder-corporation context the following factors should be considered: (a) whether the shareholder sought to be charged owns all or most of the stock of the corporation; (b) whether the shareholder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (c) whether the corporation has grossly inadequate capital; (d) whether the shareholder uses the property of the corporation as his own; (e) whether the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; (f) whether the formal legal requirements of the corporation are observed. *Jackson*, 514 P.2d at 1173. In this case the superior court did not find that any of these factors were present other than Robert Uchitel's ownership of Uchitel Co. and Visions. Our review of the record indicates that insufficient evidence was presented to warrant piercing the corporate veil under this approach.

We conclude therefore that the imposition of personal liability was erroneous under the *Elliott* or the *Jackson* analysis and that the judgment against Robert Uchitel must be reversed and vacated.

IV. *Did the superior court err in its findings regarding breach of the contract?*

The superior court made the following findings regarding the breach of the contract: that the breach did not occur on March 30, 1978, but at some later point; that appellants breached the contract by refusing to allow installation of the phone system, and by refusing to make the payments required; that TTC substantially completed its work prior to appellants' breach.

The issue here is whether the superior court's findings are specific enough as to the date of breach to resolve the issue of mitigation. Appellants argue that it was reversible error on the superior court's part to fail to specify a specific date for breach because the exact date of breach was required to measure damages and because the date of breach was critical for determining mitigation of damages (when TTC should have stopped further work on the contract). Appellants' position is that even if there was a contract TTC should have mitigated damages by stopping work on March 30, 1978, the date on which Davis advised Alden not to spend any more money.[15]

■ The superior court found that the breach occurred well past March 30, and that TTC had substantially completed its work prior to the breach. The superior court further found that as late as mid-April appellants still had not repudiated the contract, and the evidence shows that TTC halted its work by mid-April. A finding as to the exact date of breach was not needed to resolve the mitigation question in this case since the evidence supports the trial court's finding that TTC stopped all work

14. Although the instant case does not involve a parent-subsidiary relationship we think that the determination of the liability of an individual shareholder is analytically similar:

> [W]hen ... the corporation is so operated that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State, the corporate entity will be disregarded and the corporation and the shareholder treated as one and the same person, it being immaterial whether the sole or dominant shareholder, is an individual or another corporation.

*Henderson v. Security Mortgage & Fin. Co.*, 273 N.C. 253, 160 S.E.2d 39, 44 (1968).

15. The superior court in its conclusions of law determined that the Uniform Commercial Code was applicable by analogy. It further concluded that the proper measure of damages was AS 45.05.208(b), now codified as AS 45.02.708(b), which provides in part:

> [T]he measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer ....

The measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer ....

A finding of the specific date of breach would have been required if the superior court had used the traditional damage formula which considers the difference between the contract price and the market value of the goods at the time of breach. AS 45.02.708(a).

prior to receiving notice of appellants' repudiation of the contract. We therefore conclude that the superior court's findings regarding the breach of contract were sufficient to satisfy the requirements of Civil Rule 52.[16]

V. *Did the superior court err in its award of damages?*

The superior court found that TTC was a "lost volume" seller entitled to the profits it would have made if the contract had been performed. The superior court held that AS 45.05.208(b), now codified as AS 45.02.708(b), provided the proper measure of damages. This section of Alaska's Uniform Commercial Code provides:

> If the measure of damages provided in (a) of this section is inadequate to put the seller in as good a position as performance would have done, then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in AS 45.02.710, due allowance for costs reasonably incurred, and due credit for payments or proceeds of resale.

■■■ The real issue here is whether the superior court properly applied AS 45.02.708(b) to award TTC its lost profits. Lost profits will be awarded in the circumstances where normal damages (market price/contract price differential) would not place the seller in the same position he would have been in had the contract been fully performed. Here TTC was entitled to its lost profits under AS 45.02.708(b) since the record shows that the phone system TTC designed was specifically modified for appellants and was not generally marketable.[17] We therefore uphold the superior court's decision to award TTC its lost profits, and we now consider appellants' claim that the court erred in its assessment of TTC's lost profits.

■■■ In its determination of lost profits the superior court found that the contract consisted of the lease agreement and the option to purchase and concluded TTC was entitled to $73,332, the sum TTC would have received if appellants had made all of the lease payments. Appellants contend that the damages should have been determined according to the alternative contract theory. Under this theory appellants argue that the superior court should have based its calculations of lost profits on the $45,000 option price, rather than the total lease price of $73,332.

> An alternative contract is one in which a party promises to render some one of two or more alternative performances either one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party.[18]

In *McBain v. Pratt*, 514 P.2d 823, 827 (Alaska 1973), we stated:

> The damages for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in case of breach without an election, in accordance with the alternative that will result in the smallest recovery.[19]

16. Alaska R.Civ.P. 52 requires that the trial court's findings of fact and conclusions of law indicate that consideration was given to each issue of significance. *Urban Development Co. v. Dekreon*, 526 P.2d 325, 328 (Alaska 1974). Findings are sufficient if they provide the reviewing court with a clear understanding of the basis for the trial court's decision. *Wigger v. Olson*, 533 P.2d 6, 7–8 (Alaska 1975). Here the findings demonstrate that the superior court considered and rejected appellants' claim that the breach occurred on March 30 and that TTC failed to mitigate damages.

17. Lost profits are recoverable where the seller has completed goods at the time of the buyer's breach, but the goods have no general market value. The goods may have been specifically designed so that they are practically useless to anyone but the original buyer. *Anchorage Centennial Development Co. v. Van Wormer & Rodrigues, Inc.*, 443 P.2d 596, 599 (Alaska 1968).

18. 5A Corbin, Corbin on Contracts, § 1079 at 453 (1964).

19. *Quoting* Restatement of Contracts § 344 (1932).

Appellants contend they could have discharged the contract by making 84 lease payments or by purchasing the equipment under the option and that damages should have been based on the lower option price because the contract was breached prior to any election.

The purchase option could have been exercised at any time during the lease period.[20] The superior court concluded, however, that the option letter had no bearing on the case since appellants breached the lease prior to relying on the option. In our view this ignores the fact that the option letter formed part of the consideration for the contract. We therefore conclude that the superior court erred in not applying the alternative contract theory and thus calculating the lost profits of TTC based on the $45,000 option price.[21]

## VI. *Did the superior court err in failing to credit appellants with resale proceeds?*

■ We find this aspect of the superior court's damages award must also be remanded for redetermination. The trial court concluded that appellants were entitled to a credit of $7,284.60, representing $7,153.10 TTC allegedly recovered from the resale of some of the Uchitel equipment to ASAG,[22] plus $131.50 for equipment which TTC never ordered. Appellants' primary contention here is that they are entitled to a credit of $33,920.00 based on their estimate of the total proceeds TTC received from the subsequent sale to ASAG.

It appears that the superior court calculated appellants' credit from a schedule of costs prepared by TTC. This schedule is evidently incorrect since it lists as a resale

credit a figure of $5,518.00, which represents the alleged discount TTC gave to ASAG. This was money which TTC lost/discounted in the resale of equipment to ASAG and should not have been included in the resale proceeds. The fundamental error in the schedule, however, is its failure to specify the price obtained by TTC from its resale to ASAG. It is impossible to calculate the resale credit without first establishing the amount obtained from the resale to ASAG. The figure of $16,043.60, designated on the schedule as "Actual Equipment Purchased", apparently represents TTC's wholesale costs for the components, not the purchase price actually paid by ASAG for the assembled system.

Appellants' assertion that they are entitled to a credit of $33,920.00 may also be incorrect since it is based on the as yet unproven assumption that the $33,920.00 estimated resale figure does not include any amounts received for equipment that was not originally part of the system designed for the appellants.[23] An accurate resale credit would therefore consist of a $3,372.00 refund from equipment which TTC returned to its suppliers, plus the purchase price of the rejected equipment later sold to ASAG, less the costs incurred in reselling this equipment.

We note that there is some uncertainty regarding the appropriateness, under the lost profits theory, of allowing a credit for the proceeds obtained by an aggrieved seller from the resale of the rejected goods. Under the terms of the lost profits formula set out in the Uniform Commercial Code[24] a breaching buyer is theoretically entitled to a credit for any payments or proceeds

---

**20.** This fact refutes TTC's argument that appellants made an election by deciding to go forward with the lease.

**21.** Our disposition of this issue makes it unnecessary for us to reach appellants' argument that the award of the total lease price, which included future lease payments, should have been reduced to present value. In addition, we need not address appellants' claim that the award of interest on the portion of the judgment attributable to future lease payments was erroneous.

**22.** *See* note 5 *supra.*

**23.** The record does not reveal what percentage of the system sold to ASAG consisted of equipment originally included in the phone system designed for the appellants. Appellants would be entitled only to this percentage of the resale proceeds.

**24.** AS 45.02.708(b).

the seller receives from resale of the goods. The net result, however, of giving the buyer due credit for the resale may be the elimination of the seller's lost profit recovery.[25] Commentators have argued that where the seller is able to demonstrate that he could and would have supplied both buyers, thereby making two sales and profits instead of just one, the court should simply ignore the "due credit" language in its award of lost profits as damages for the first buyer's breach.[26]

We need not resolve this issue, however, because the terms of the contract between TTC and appellants specifically provide that the appellants be given credit for amounts received by TTC from any resale of the equipment upon default by the appellants.[27] The question whether credit must be given under the lost profit formula in AS 45.02.-708(b) is therefore irrelevant to the determination of damages in this case.

For the reasons above we conclude that the proper resale/refund credit will have to be determined by the superior court on remand.

## VII. Did the superior court err in admitting exhibits 16A, 16B and 18?

▪ Civil Rule 61 provides that errors in the admission or exclusion of evidence are to be judged under the harmless error rule.[28] Unless appellants can demonstrate prejudice by virtue of the superior court's admission of Exhibits 16A, 16B and 18, the correctness of the superior court's ruling admitting these exhibits is irrelevant. *See Otis Elevator Co. v. McLaney*, 406 P.2d 7 (Alaska 1965). Exhibits 16A and 16B were merely estimates of labor and material costs allegedly prepared by TTC's employees from memory. The factual figures contained in these exhibits were cumulative of testimony of other witnesses. Thus, we conclude any error in the admission of these documents was harmless error. Exhibit 18 dealt with the resale of the Uchitel equipment and was relevant only as to the issue of reimbursement to appellants. As the superior court noted, if anything, Exhibit 18 aided appellants since it established a mitigation of damages. We thus conclude that any error in the admission of this exhibit can also be characterized as harmless error.[29]

25. Where the resale price is equal to or greater than the lost profit on the original sale plus the costs reasonably incurred in manufacturing and reselling the product, the seller's net recovery from the breaching first buyer would be zero. The problem with this result is that it fails in some cases to adequately compensate the seller for the loss of the first sale. In other words this award may not put the seller in the same position he would have been in absent the breach, since if the first buyer had performed the seller would have made two sales and profits instead of just one.

26. J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 7-13, at 234–35 (1972).

27. Paragraph 14 of the lease agreement states: Upon occurence [sic] of any event of default, Lessor [TTC] may upon written notice to Lessee, terminate this lease, take possession of the equipment and for this purpose enter upon the premises and remove it, and the sale, re-lease or other disposition of the equipment shall not affect the obligation of the Lessee provided herein, *except that Lessor shall credit against Lessee's obligations hereunder the amounts received by Lessor, after deducting the expenses thereof, from any such sale, re-lease or other disposition.*

The giving of actual notice is excused if Lessee cannot be found on the premises during normal business hours. Lessee shall be liable for any arrears in rent and all costs and expenses incurred in connection with Lessor's attempt to prevent default, repossession, repair, storage, sale or lease of the equipment, including attorneys' fees. (Emphasis added.)

28. Alaska R.Civ.P. 61 states:
No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

29. Our conclusion that admission of Exhibit 18 was harmless error is strengthened by our holding that the case is to be remanded for redetermination of damages.

VIII. *The superior court's denial of appellants' motion for a new trial.*

■ Appellants moved for a new trial pursuant to Civil Rule 59 on the ground of newly discovered evidence.[30] Specifically, appellants pointed to two newly discovered witnesses, Irene Bartee, an employee of ASAG, and Mike Ishihara, a former employee of TTC who allegedly worked on the Uchitel project.

■ Appellants fail to explain how they came to discover Ishihara's identity. It is significant that Elden H. Smith, a witness for appellants, testified at trial that he worked with Ishihara on the Uchitel project. Thus, it appears that Smith was aware of Ishihara's identity prior to trial. It therefore is not unreasonable to conclude that the appellants should have discovered Ishihara's identity prior to trial.

Appellants first learned of the witness Bartee through the information contained in Exhibit 18 which TTC failed to produce prior to trial.[31] Since Bartee's testimony concerning the resale to ASAG is relevant to the issue of damages, upon remand Bartee's testimony should be heard.

IX. *Did the superior court err in denying Gould's motion for costs and attorney's fees?*

The superior court entered judgment against Uchitel Co., Visions, and Robert Uchitel but it did not render any judgment as to R. J. Gould. In its findings of fact the superior court concluded that Gould exe-

cuted the lease agreement as the authorized agent of Visions, Uchitel Co., and Robert Uchitel. Gould appeals the superior court's denial of his motion for costs and attorney's fees.

■ The decision to award costs and attorney's fees, under Civil Rules 54 and 82, is within the discretion of the court and is reviewed under the abuse of discretion standard.[32] In *Cooper v. Carlson*, 511 P.2d 1305 (Alaska 1973) the superior court rendered judgment generally in favor of the plaintiff but refused to award costs and attorney's fees. On appeal we held that since plaintiff had prevailed on all liability issues he was a prevailing party, even though he had not recovered any damages. *Id.* at 1308–09. It was recognized, however, that in certain situations the denial of attorney's fees to a prevailing party might be a proper exercise of discretion. Since the superior court in *Carlson* had not explained its refusal the case was remanded for reconsideration. *Id.* at 1309–11. In the instant case the superior court did not offer an explanation for its decision to deny costs or attorney's fees to Gould. As in *Carlson* we think the most appropriate disposition is to remand the matter to the superior court, "to determine whether attorney's fees should be allowed or denied in its discretion, in which event the reasons for exercising such discretion should be set forth." *Id.* at 1311.[33]

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in conformity with this opinion.

---

30. In *Montgomery Ward v. Thomas*, 394 P.2d 774, 776 (Alaska 1964) the standards for granting a new trial on the basis of newly discovered evidence were set out:

> These requirements are that the evidence: (1) must be such as would probably change the result on a new trial; (2) must have been discovered since the trial; (3) must be of such a nature that it could not have been discovered before trial by due diligence; (4) must be material; (5) must not be merely cumulative or impeaching.

31. TTC concedes that it failed to produce Exhibit 18, claiming that its failure was due to inadvertence.

32. In *Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974), this court stated:

> We have further held that the award of costs and fees to the prevailing party is clearly within the broad discretion of the trial court. Like the award itself, the actual determination of who the "prevailing" party is is also within that discretion.

(Footnotes omitted.)

33. TTC's argument that Gould's costs bill overstates his actual costs is more relevant to the question of the size of the award than to whether any award should be made. This argument and the fact that Gould did not appear at trial can be presented to the superior court on remand.