LAKE OTIS CLINIC, INC., and Michael F. Beirne, Appellants,

v.

STATE of Alaska, Appellee.

Michael F. BEIRNE, M.D., and Lake Otis Clinic, Inc., a non-profit corporation, Appellants,

v.

STATE of Alaska, Appellee.

No. 5441.

Supreme Court of Alaska.

Sept. 17, 1982.
As Amended on Denial Rehearing Nov. 4, 1982.

determining the fee ...", it would then become necessary to segregate time.

Robert C. Erwin, Erwin, Smith & Garnett, Anchorage, for appellants.

William T. Council, Julienne E. Bryant, Carpeneti & Council, Juneau, for appellee.

Before BURKE, C. J., RABINOWITZ, CONNOR and MATTHEWS, Justices, and SHORTELL, Superior Court Judge.*

## OPINION

MATTHEWS, Justice.

### STATEMENT OF THE CASE

Following a court trial in this case appellants, Lake Otis Clinic, Inc., a non-profit corporation [LOC] and its founder and president, Michael F. Beirne, M.D. were ordered to repay to the State of Alaska the entire amount of a $312,500 grant received by LOC under AS 43.18.010(j),[1] plus interest,

---

\* Shortell, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

1. AS 43.18.010(j) provided at all relevant times herein:

> If construction of a facility began after January 1, 1968 and state matching aid for construction approved for payment to the local government or other facility sponsor constitutes less than 25 per cent of the total project cost, the state shall pay to the local government or other facility sponsor each fiscal year a sum equal to $2,500 a bed for the maximum number of beds provided for in the construction design of the facility. State aid provided for in this subsection shall continue until the local government or other facility sponsor has received an amount which, combined with state matching money for construction of the facility, equals 25 per cent of the total project cost. No funds received for construction shall be used for any other purpose.

costs, and attorneys fees. They make three arguments in support of their appeal: (1) the court erred in determining that AS 43.18.010(j) funds could only be used to pay for actual construction; (2) the court erred in determining that misrepresentations made by appellants in seeking further funds justified the order to repay the grant which was not itself awarded based on any misrepresentation; and (3) the court erred in finding Beirne personally liable to repay the grant. For the reasons stated below, we agree with the first two arguments asserted but disagree with the third.

## STATEMENT OF FACTS

While the events giving rise to this case took place over a considerable period of time and differing inferences as to knowledge and intent can be drawn from them, the underlying occurrences are not controverted.

LOC was formed by Beirne in 1967 as a non-profit corporation. Its board of directors, consisting of Beirne and members of his family or an employee, was effectively controlled and directed by Beirne. Beirne's plan was to build a 125 bed hospital on property which he owned on Lake Otis Road in Anchorage, Tract 3 of the Medical Park Subdivision. The hospital's estimated cost, with equipment, was $10,000,000.

In early 1972, General Health Services of Los Angeles [GHS] agreed to lease and operate the hospital for twenty-five years. Under the lease GHS was to pay off the mortgage debt and all expenses associated with the hospital's operation. However, neither a full construction loan, nor full long-term financing, was ever arranged.

In 1973 LOC obtained a partial construction loan of $900,000 from People's Bank and Trust. This loan was guaranteed by GHS, whose guaranty in turn was guaranteed by Beirne. Beirne's guaranty was secured by deeds of trust on Tract 3 and on thirteen other parcels of real property owned by Beirne or by three business corpo-

rations which he owned. [Hereinafter collectively referred to as Beirne].

In the summer of 1973 construction of the hospital began.

The August 28, 1973 minutes of LOC's Board of Directors indicate that LOC agreed to pay Beirne an annual fee of six per cent of his separate property's appraised value for its use as collateral, ultimately, for the $900,000 loan. The minutes also reflect that it was anticipated that state grant funds would be available to LOC to meet this obligation.

At a special meeting of the Board on August 29, 1973 it was resolved that LOC would either buy, for $400,000, or lease Tract 3 from Beirne before the end of calendar year 1974. The final sentence of the resolution states that Beirne would execute a deed to LOC immediately "with the understanding that the property will be deeded back and leased, instead of purchased, if taxable bonds are used for financing." Beirne contemporaneously did sign, deliver, and record a deed of the property to LOC.

In October of 1973 GHS withdrew from the hospital project under a clause in its contract with LOC permitting it to do so if mortgage rates should exceed 10%. Beirne thereafter devoted himself to finding other means by which the hospital could be constructed. Actual construction was halted in the spring of 1974 after pilings had been driven. As of the time of trial, construction had not been resumed.

In March of 1974, LOC applied for $312,500 in state funds for fiscal year 1975. AS 43.18.010(j) provides that a facility sponsor building a hospital may receive each fiscal year $2,500 per hospital bed up to 25% of the total project cost.[2] In its application LOC represented that the hospital was planned to have 125 beds and that its estimated cost, including equipment, was $10,000,000.

By March 17, 1975 GHS had paid Peoples Bank $900,000 in principal and $121,294.23 in interest in full satisfaction of its guaran-

---

**2.** The full text of section .010(j) is set forth at note 1, *supra.*

ty of the loan to LOC. GHS then began pressuring Beirne to make good on his indemnity agreement. On March 20, 1975, LOC transferred Tract 3 to GHS. In October of 1975 a document entitled "Caveat" was recorded by LOC stating that the deed it had given to GHS was intended for security only, and not to transfer title.

In November of 1975, GHS began non-judicial foreclosure proceedings on Tract 3. To prevent foreclosure Beirne sold some of the collateral property in order to pay his guaranty. By December of 1977, Beirne had totally discharged his obligation to GHS by paying $1,244,055.67.

The $312,500 grant applied for by LOC in March of 1974 was actually paid in January of 1975. No express conditions were made a part of the award. LOC turned this money over to Beirne. The trial court found that Beirne used this money to make payments on various parcels of real property which he owned. The testimony supporting this finding indicates that this was some of the property being used for collateral on Beirne's guaranty to GHS. Beirne testified that he did not use the money directly to pay Peoples Bank and Trust because, to use his words:

> [I]t didn't make any sense to pay off Peoples Bank and Trust, because the Three Hundred Twelve Thousand Dollars wasn't going—wasn't going to be a drop in the bucket, and the bank would still have foreclosed on us through General Health Services. So if we wanted to survive, the prudent thing to do was to clean up the rest of our credit and—and keep the show on the road. . . . Otherwise we were going down the tube right now.

The record does not indicate that the state ever requested an accounting for the $312,500 which it granted to LOC. However, in November of 1975, LOC sought a grant from the state for 1976, and submitted a list of expenditures totalling $1,200,000, including interest and finance charges. The state took the position that this itemization was insufficient to warrant

further grants under subsection (j). Subsequently, on May 30, 1976 LOC submitted a listing of project costs totalling $2,467,500. Three weeks later LOC supplemented this statement by adding $630,000, as the fee for three years' collateralization of the real property securing Beirne's guaranty, and approximately $64,000 in fees paid to one Kingston Peters for his services in selling some of the collateral property in an effort to avoid foreclosure.

In response to LOC's request for additional grants the state sent an auditor, George Elgee, to examine various records at the joint offices of Beirne and LOC. Of the more than $3,000,000 in expenses claimed by LOC, Elgee disallowed all but $861,-843.89. He concluded that LOC was entitled to a grant of only a quarter of this sum or $215,460.97 and had therefore been overpaid by $97,039.03. Elgee also concluded that an additional grant for 1976 was not justified.

LOC contested the disallowance of expenditures made by Elgee. Elgee then made a second report dated February 14, 1977. This report adhered to the disallowances stated in the first report, expressed doubt as to whether the hospital would ever be built, and recommended that the state ask for the return of all funds granted LOC.

The state did not grant LOC's applications for funds for 1976 or 1977. On October 31, 1977 the state sued LOC seeking an accounting and a refund of that amount of money paid LOC not used in conformance with AS 43.18.010(j). On the same day Beirne and LOC sued the state seeking grant funds for 1976 and 1977. The actions were consolidated.

On cross-motions for summary judgment the superior court ruled that LOC's applications for funds for 1976 and 1977 were properly denied. This ruling has not been appealed.

The case came on for trial on three issues which were, as defined by the court:

(1) Whether LOC had incurred at least $1.25 million[3] in total project costs.

(2) Whether the state money had been spent for hospital construction or at the very least for a public purpose.[4]

(3) Whether Beirne had made misrepresentations or dealt in bad faith with the state.

With respect to the first issue, the court found that no more than $927,813 in total project costs had been proven. As to the second, the court found that the payment of the grant funds by LOC to Beirne was not permissible under the statute and was not for a public purpose. With respect to the third issue, the court found that Beirne had made misrepresentations and thereby had dealt in bad faith with the state in connection with the submittals he made after receiving the initial grant. The court concluded that its decisions on the second and third issues were independent bases for requiring repayment of the entire grant. The court also concluded that Beirne personally, as well as LOC, was liable for repayment.

### EXPENDITURE OF AS 43.18.010(j) FUNDS

Beirne regarded the transfer of the grant funds from LOC to himself as reimbursement for legitimate hospital project expenditures which he had paid or incurred. The trial court, however, ruled that using subsection .010(j) funds for reimbursement was not permissible. The court stated that .010(j) "funds can be spent only for actual construction costs, not for other costs that may, when taken together, comprise the 'total project cost.'" The trial court explained its interpretation as follows:

> The court is aware that its interpretation of the last sentence of § 10(j) ... requiring state funds to be spent only on construction costs, could cause administrative difficulties in determining entitlements under the statute. For example,

suppose a 125-bed hospital with a "total project cost" of $20 million and construction costs of three-fourths of that amount was completed in two years. Under the statutory formula, the facility sponsor would be entitled to receive up to $5 million at the rate of $312,500 per year. If the hospital is already built, however, it has no more "construction costs" in a literal sense, although it may be repaying debts attributable to construction costs. Arguably, then, it would not be entitled to receive any more funds under § 10(j), and the facility sponsor would in effect be penalized for the early completion of the project. Unfortunately, the legislative history of § 10(j) and other interpretative aids provide no resolution to this anomaly, and the rather narrow reading given to the last sentence of § 10(j) appears to be required by the words used in the statute.

When § 10(j) is read in conjunction with § 10(f), a possible reading of the first subsection is that what was intended was to restrict the use of § 10(j) funds to hospitals, as opposed to other purposes for which revenue sharing funds may be spent. Under this reading, § 10(j) funds could be used not only for construction costs but for all project costs, including even the cost of maintenance and operation of the completed hospital. This is not, however, the intention expressed in § 10(j). "Construction" is clearly the subject of this subsection; the term is used five times. This is plain enough to preclude a second alternative interpretation of the last sentence which would allow funds received under § 10(j) to be spent for purposes other than construction unless the granting authority specifically restricts their use to construction only. The legislature has already imposed that restriction by the terms of § 10(j)....

> No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose.

---

3. Twenty-five per cent of $1.25 million is $312,500. Thus the lowest project cost figure which would justify the $312,500 grant was $1.25 million.

4. This is in reference to Article IX, Section 6 of the Alaska Constitution which provides:

Subsection 10(j) does not provide merely for reimbursement.

We believe that the trial court construed section .010(j) too narrowly.

The most striking thing about section .010(j) is that while its last sentence provides that "[n]o funds received for construction shall be used for any other purpose," it does not specify that the annual grants of $2,500 per bed are funds received for construction. However, the statute does refer to a category of funds which are funds received for construction, namely, "state matching aid for construction." Such funds are distinct from the $2,500 per bed allowance and are provided for in AS 18.25.010–.030.

We believe, therefore, that the final sentence of section .010(j) does not mean that all section .010(j) grant funds are funds received for construction. That sentence expressly applies to the separate category of state matching aid for construction. It may also be construed as a grant of authority to the State Department of Community and Regional Affairs to specify in a particular grant that section .010(j) funds shall be used only for construction. However, there was no such condition on the grant received by LOC.

This interpretation avoids the anomalies which follow from the conclusion that the $2,500 per bed annual payments must be expended directly for construction. A hospital might be completely built and construction costs paid many years before the annual per bed entitlement has been disbursed. Under the construction-costs-only view of section .010(j), such a hospital would be able to utilize the section .010(j) grant only during the limited period during which construction creditors were unpaid. For example, using the initial size and costs estimates in this case, assume that a 125 bed hospital costing $10,000,000 is built in two years. The hospital sponsor's entitlement would be $312,500 annually until $2,500,000 had been received, which would take eight years. It would be contrary to the apparent intent of section .010(j) to conclude that the hospital sponsor was not entitled to payments in the years following the completion of construction simply because there were no unpaid suppliers or contractors.[5]

Our interpretation of section .010(j) is also consistent with the testimony of John Chenoweth, the state official in charge of the grant program at the time in question.[6] At trial Chenoweth was asked whether it was his interpretation of the grant that the funds had to be used directly for construction "rather than just reimbursed for other expenditure." He answered that in his view reimbursement was permissible:

I would have, I think, allowed a little bit of leeway here in terms of use of the funds, particularly since the recipient had one project and either had to commit

5. The trial court in its order concerning LOC's objections to the form of Memorandum of Decision submitted by the state and adopted by the court recognized that section .010(j) does not require that in all cases funds be used to pay direct construction costs. The court gave the following example:

Sponsor obtains the necessary certificates, plans and permits, and obtains a $10,000,000 loan to construct a 100 bed hospital, which is completed within one year. Sponsor's entitlement under § .010(j) is $2,500,000, payable at the rate of $250,000 per annum for 10 (ten) years. Each year the entitlement is paid to reduce the loan. While in a literal sense "construction costs" ceased at the end of construction, in fact they were still being paid for until the loan was repaid. § .010(j) says in pertinent part that "State aid ... shall continue until the ... sponsor has re-

ceived ... 25 percent of the total project cost." The Court views this as a permissible interpretation of the statute and application of the funds.

While we agree with the view that section .010(j) funds may be used to reimburse a mortgagee, no provision in the statute limits reimbursements to mortgagees as distinct from other creditors. Nor does the statute require that the hospital use section .010(j) funds to make extraordinary payments on a long term mortgage, in preference to other legitimate expenditures.

6. At the time LOC was paid the $312,500 grant Chenoweth was director of the Division of Local Government Assistance of the Department of Community and Regional Affairs. Chenoweth testified that he made the final decision on the grant.

them to that project or—or otherwise in some—you know, in some way, shape or form. I—I did not understand that he had to trace the particular funds through as long as he could show that off-setting amounts were used in conjunction with the construction of the—of the project.

■ At the time of trial there was no question but that Beirne as the final guarantor of the Peoples Bank loan to LOC had paid $1,244,055.67 in discharge of LOC's obligation. He was, to that extent at least, a legitimate creditor of LOC. We are therefore unable to conclude that LOC's transfer of the $312,500 to Beirne was an impermissible expenditure of section .010(j) funds.[7]

■ Similarly, we find no violation of the public purpose clause of Article IX, Section 6 of the Alaska Constitution.[8] The parties do not question that state aid to private non-profit hospitals is a legitimate public purpose. It follows that such aid is constitutional so long as it is used for any legitimate expense related to the construction, operation, or maintenance of the hospital. Reimbursement of a guarantor who has had to pay a hospital construction loan plainly falls within these categories.

## SUBSEQUENT MISREPRESENTATIONS

■ As an alternative basis for requiring repayment of the $312,500 grant the trial court concluded that Beirne had materially breached his duty of good faith by misrepresenting, in November of 1975 and in May and June of 1976, expenditures made for the hospital project. On appeal this conclusion is attacked on legal rather than factual grounds. Appellants argue that the misrepresentations identified by the court were made in an attempt to obtain grant money for fiscal years 1976 and 1977. With respect to the funds actually received for 1975

no misrepresentations were made and thus, according to appellants, "there can be no action herein for Beirne had done nothing wrong at that point nor had the State relied on anything that Beirne had done before giving him the money." The state's theory, which the trial court adopted, is that appellants had a duty honestly and in good faith to account for the use of the funds received and for project costs sufficient to justify the grant, that they breached this duty, and that to remedy this breach a return of the entire grant is required.

In our view the evidence fails to show that appellants breached any duty with respect to accounting for the use of the funds received. Nothing in the record indicates that appellants withheld from the state any information as to the use of the $312,500 grant. The absence of any such evidence is dispositive of the trial court's decision that appellants were in breach of contract for failure to account for the use of the grant.

On the other hand there is evidence that there were errors and exaggerations in the applications appellants submitted for 1976 and 1977 grant funds. The question is whether these warrant a return of the 1975 grant. In our view they do not.

We would have no hesitation in ordering a refund of money which had been awarded based on false representations. Likewise, if the grant had been expended for an illegal purpose a refund would be appropriate. However, those situations do not exist here. What has occurred is that misrepresentations have been made in the course of seeking additional funding. There is nothing in the statute, or in any regulations, or in any terms of the grant, which explicitly or implicitly provides for a refund under this circumstance. In the absence of such a provision, it would be manifestly unfair to

7. Questions can be raised about the timing of the transfer of the grant to Beirne. The transfer was made in 1975 before Beirne had paid the guaranty, but after the requirement that he do so had become highly likely. In view of this and of the fact that the funds were used to make payments on real property which Beirne had used as security for his guaranty, several parcels of which were sold in order to raise the

money to pay the guaranty, we do not regard the advance payment to be a critical factor. However, in an accounting between LOC and Beirne, LOC should be given credit for interest and, of course, LOC's debt to Beirne must be reduced by the amount of the grant.

8. *See* note 4, *supra.*

require appellants to repay an honestly obtained grant merely because later grant applications contained misrepresentations.

Our conclusion in this respect is in accord with that of a leading commentator on the subject of grant law:

> The extent and manner by which federal agencies may seek refunds for illegal grantee expenditures are unclear, the great majority of grant-in-aid statutes being silent on the question. Because traditional contract principles are inappropos to an understanding of grant rights and responsibilities, one cannot simply assume that grantee breaches give rise to correlative grantor rights, such as the right to recapture improperly expended funds. The source of both liability and remedy must emanate explicitly or implicitly from the grant statutes, regulations duly enacted and consistent with the statute, or provisions in the grant agreement.... The correct analysis is that the statutory duty of federal agencies to administer grants-in-aid is necessarily accompanied by the power to enforce grant conditions through reasonable means. By regulation, therefore, the grantor can empower itself to recover federal payments illegally expended by the grantee, either by deductions from future payments, withdrawal of advanced funds, or lawsuits when the first two alternatives are not available. The typical audit disallowance, in fact, is a clear example of the exercise of this implicit authority. *If the grantor, however, has failed to establish such a right of recapture through provisions in the grant agreement or duly promulgated regulations, it may well have forfeited its ability to impose the sanction in the absence of explicit statutory authority. Because of such failure, no legal basis would exist for the sanction; it would also be unfair to grantees to subject them to unannounced and improvised detriments.*

R. Capalli, *Rights and Remedies Under Federal Grants,* at 98–99 (1979) (emphasis added, footnotes omitted).

## REMEDIAL ISSUES

■ The trial court found that appellants presented proof sufficient to justify only $927,813 in total project costs. Appellants challenge this finding, claiming it to be erroneous because it does not include the land value of Tract 3, or interest, or the "interest due to Beirne for the use of his property for collateral to obtain the construction loan."

With respect to the land we find no error. Although Tract 3 clearly had value, there is no unequivocal evidence that, as between Beirne and LOC, LOC was to be the owner rather than the lessor of the property. Further, there is no evidence that GHS reconveyed the property to LOC rather than to Beirne.

■ With respect to construction loan interest, the superior court ruled prior to trial that such interest would be included within total project costs so long as it was reasonably and necessarily incurred. The court found at trial that if the $900,000 loan from Peoples Bank and Trust had "been paid off on time, the total interest due would have been $61,617." The court did not, however, include the $61,617 figure within total project costs. In failing to do so the court erred. The Peoples Bank partial construction loan consisted of two notes which became due on August 29, 1974 and November 28, 1974. These are the dates to which the court was referring in relating what the interest would have been had the loan been paid on time. However, in LOC's application for state aid the time for completion of construction of the hospital was estimated to be March of 1975. It was therefore anticipated that interest on construction loans would continue until at least that time, regardless of the particular due date on individual notes. The record indicates that interest on the $900,000 loan was actually paid Peoples Bank and Trust through March 17, 1975 in the amount of $126,-984.95. This sum should have been included within total project costs.

With respect to the fee claimed for the use of Beirne's property as collateral, called interest by appellants, the court did not err

in refusing to include it within total project costs. There was evidence, and the superior court found, that the fee requested by Beirne was excessive. On the other hand, there was no evidence as to what a reasonable fee would be or as to whether any fee would be reasonable.

In accordance with the foregoing the court's finding respecting total project costs should be increased by $126,984.95. This means that LOC was entitled to a grant for fiscal year 1975 of 25% of $1,054,798 or $263,700, rather than $312,500. There has thus been an overpayment of $48,800. The state is entitled to a refund of this sum.

The final issue is whether Beirne as well as LOC should be liable for payment of the refund. The superior court made extensive factual findings explaining its conclusion that Beirne should be liable, including:

1. That LOC was undercapitalized;

2. That Beirne as founder, as a director, and as president of LOC had substantially failed to observe corporate formalities;

3. That the other officers or directors of LOC did not exercise independent judgment and were controlled by Beirne;

4. That LOC was operated by Beirne as if it were a division or part of a single enterprise which also included his own personal businesses.

These determinations are issues of fact which are not challenged as erroneous on appeal. They justify holding Beirne individually liable, along with LOC, for the refund of the overpayment. *See Uchitel Co. v. The Telephone Co.*, 646 P.2d 229, 235 (Alaska 1982).

The judgment of the superior court is REVERSED and the case is REMANDED with directions to enter judgment in accordance with the views expressed herein.

REVERSED and REMANDED.