**L.D.G., INC., an Alaska Corporation, and Larry Gjovig, Appellants and Cross–Appellees,**

v.

**Robert J. BROWN, Personal Representative of Tracy N. Eason, Deceased, Appellee and Cross–Appellant.**

Nos. S–12409, S–12430.

Supreme Court of Alaska.

July 10, 2009.

---

1112

1114

Arthur S. Robinson, Robinson & Associates, Kenai, for Appellants and Cross–Appellees.

John S. Hedland, Hedland, Brennan and Heideman, Anchorage, for Appellee and Cross–Appellant.

Ruth Botstein, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Intervenor and Cross–Appellee State of Alaska.

Before: FABE, Chief Justice, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The personal representative of the estate of a woman who was shot and killed by an intoxicated man sought damages, on behalf of the woman's two surviving dependents, from a bar that allowed the man to consume alcohol while he was already intoxicated just prior to the shooting. Following a jury trial, the superior court imposed dram shop liability in favor of the personal representative, dismissed the single shareholder of the bar's corporate owner from the lawsuit, and applied a single damages cap to the non-economic damages awarded to the decedent's two surviving dependents. The corporate owner of the bar challenges (1) the superior court's entry of a judgment notwithstanding the verdict after the jury made factual findings but refused to assign legal cause to the bar; (2) the trial court's decision that the plaintiff's complaint was sufficiently broad to include the violation of the dram shop act alleged here; (3) the trial court's refusal—at a subsequent trial for damages—to allow appellant to introduce evidence of the facts and circumstances surrounding the decedent's death; (4) the trial court's instruction on legal cause in the damages trial; and (5) the trial court's decision to permit hearsay testimony in the damages trial. The personal representative (1) challenges the trial court's dismissal of the single shareholder of the bar's corporate owner from the suit and (2) argues that the damages cap is unconstitutional on its face and as applied and, if it is constitutional, that the trial court should have imposed a separate damages cap for each surviving decedent. The state, as intervenor, argues that the damages cap statute is constitutional. For the reasons stated below, we affirm the superior courts's decisions on all issues with the exception of its dismissal of the single corporate shareholder from the lawsuit. On that issue, we remand for retrial.

## II. FACTS AND PROCEEDINGS

### A. Facts

R.V. Freeman spent the evening of July 17, 1998 consuming alcohol at the J Bar B. The J Bar B is owned by L.D.G., Inc., a corporation individually owned by Larry Gjovig. Freeman was served at the bar by bartender Sharine Christensen. Freeman was served eight drinks within the span of approximately fifty minutes, and allegedly had consumed more alcohol earlier in the day. Eventually, when Freeman began to appear intoxicated, Christensen refused to serve him any more alcohol. Christensen did not remove Freeman's remaining drinks, however, and Freeman consumed at least a

part of one drink after the point at which Christensen determined that he was intoxicated.

Christensen then attempted to procure a ride home for Freeman to prevent him from driving in his intoxicated condition. Freeman refused to let Christensen call him a cab and refused to give her his car keys. Eventually another bar patron, Tracy Eason, agreed to drive Christensen to Freeman's residence to pick up Freeman's girlfriend, Jeanne Iwasko, so that Iwasko could come back with them to the bar and drive Freeman home in his own car. Eason drove Christensen to Freeman's residence, but when they arrived there they discovered that Freeman had already driven himself home and was in the driveway speaking with Iwasko.

Christensen asked to use the bathroom and Iwasko let her into the house. While Christensen was in the bathroom she heard Iwasko and Freeman arguing. Christensen then heard two gunshots. Christensen eventually left the bathroom, saw Iwasko on the floor suffering from a gunshot wound, and called 911. Christensen heard more gunshots while she was on the phone with the 911 operator. State troopers arrived on the scene and arrested Freeman. Both Iwasko and Eason, who had also been shot, died from the wounds they received that night. Freeman was convicted of first-degree murder in the deaths of both Iwasko and Eason and is currently incarcerated.

### B. Proceedings

In 2000 Robert Brown, Tracy Eason's father and the personal representative of her estate, filed a wrongful death suit against L.D.G., Inc. and Larry Gjovig on behalf of the estate and Eason's surviving dependent children Jordan and Justin. The complaint alleged that the J Bar B violated Alaska's dram shop act, AS 04.16.030, when Christensen—the J Bar B's bartender—served alcoholic beverages to Freeman while he was visibly intoxicated. The complaint additionally claimed that this "negligent, reckless, and intentional" serving of alcohol to Freeman was the proximate cause of Eason's death. Brown sought actual damages, puni-

tive damages, and costs and fees on behalf of the estate and the dependents. Brown did not seek to recover any damages from Freeman himself, and neither L.D.G. nor Gjovig sought to join Freeman or assert a third-party claim against him.

At trial, the jury heard testimony regarding Freeman's level of intoxication when Christensen served him the alcoholic beverages and the circumstances surrounding Christensen's refusal to serve him any additional alcohol. Additionally, the jury heard testimony from several witnesses who described Freeman's typical behavior when sober and when intoxicated. The jury was also shown portions of a video recorded in the bar on the night in question. At the close of the trial, Gjovig moved for a directed verdict on the claims against him personally. The superior court granted Gjovig's motion, leaving L.D.G. as the sole remaining defendant.

The court then submitted the case to the jury, providing the jury with a special verdict form to determine the extent of L.D.G.'s liability. Responding to questions laid out in the special verdict form, the jury declined to find that "an employee of the J Bar B [sold] alcohol to R.V. Freeman with criminal negligence when he was a drunken person," but did find that "an employee of the J Bar B with criminal negligence allow[ed] R.V. Freeman to consume an alcoholic beverage in the bar when he was a drunken person." The jury also found that it was "more likely true than not true that, if R.V. Freeman had not been intoxicated, he would not have killed Tracy Eason." But the jury declined to find that "the intoxication of R.V. Freeman [was] so important in bringing about the death of Tracy Eason that a reasonable person would regard it as a cause and attach responsibility to it." Because the jury did not find that Freeman's intoxication was a legal cause of Eason's death, they did not reach the question of damages.

Following receipt of the jury's verdict, Brown filed a motion for entry of judgment in his favor and a new trial to determine damages. The superior court granted Brown's motion, finding that "fair-minded jurors could not have concluded that the intoxication of the murderer, who they found

would not have killed Tracy Eason but for that very intoxication, was not a substantial factor in this wrongful death." The superior court therefore entered a judgment notwithstanding the verdict, finding L.D.G. liable for Eason's death and ordering a new trial on damages. L.D.G. filed a motion for reconsideration of the order, and the superior court denied this motion. L.D.G. then petitioned this court for review; we denied the petition.

At the beginning of the new trial on damages, the superior court ordered, over L.D.G.'s objection, that the trial would be limited to the question of wrongful death damages and that the jury would not be informed of the circumstances surrounding Eason's death. The jury ultimately determined damages, using a special verdict form identifying past and future economic and non-economic damages, at $705,856 for Justin Eason and $749,026 for Jordan Eason. Each of these awards included $28,290 in past non-economic damages and $537,508 in future non-economic damages. Brown then moved for an entry of judgment setting damages at the amounts determined by the jury. L.D.G. responded with a motion for remittitur claiming that the non-economic damages were subject to a damages cap under AS 09.17.010, which would limit the non-economic damages to a total of $421,824 (based on Tracy Eason's life expectancy at the time of her death multiplied by $8,000) for the combined claims of both of Eason's surviving dependents. Brown responded to L.D.G.'s motion for remittitur by arguing that the damages cap should not apply in this case, that if the damages cap did apply there should be a separate cap for each of the boys' claims, and in the alternative that the appropriate damages cap was a one million dollar cap under AS 09.17.010(c). Brown also argued that the entire damages cap statute was facially unconstitutional as a denial of equal protection and the right to a jury trial, and unconstitutional as applied in this case because it applied an aggregate cap to multiple beneficiaries.

After the original judge, Superior Court Judge John Suddock, recused himself in January 2005 because he had previously been involved as counsel in a case relied upon by the parties regarding the constitutionality of AS 09.17.010, the case was reassigned to Superior Court Judge Morgan B. Christen. Judge Christen then entered a final judgment in April 2005 interpreting AS 09.17.010 as imposing a single damages cap. The superior court declined to address the constitutional arguments because it found that Brown had not met the burden of proof required to overcome the presumption of constitutionality. Accordingly, the superior court applied a single cap of $421,824 to the aggregate non-economic damages awarded to the boys.

Brown moved for reconsideration of the order imposing the single damages cap, asking the court to reach the constitutional issues. L.D.G. did not respond to the motion, and the superior court ordered supplemental briefing on the constitutional issues. The parties submitted supplemental briefing, and the court notified the Attorney General of Alaska that the supplemental briefing called into question the constitutionality of a statute. The court also requested amicus briefing on the constitutional questions from organizations representing plaintiffs' counsel and defense counsel. The state successfully moved to intervene in the litigation to defend the constitutionality of the damages cap legislation. The superior court ultimately found that AS 09.17.010(b) is not unconstitutional on its face or as applied. The superior court again entered a single award for both boys for non-economic damages of $421,824.

Brown and L.D.G. both appealed; the state continues to defend the constitutionality of the damages cap.

## III. STANDARD OF REVIEW[1]

We review *de novo* the grant of a directed verdict and the grant of a judgment notwithstanding the verdict to determine whether the evidence, viewed in the light most favorable to the non-moving party, is

---

1. More extensive analysis of the relevant standard of review for particular issues is provided where appropriate in the discussion below.

such that reasonable persons could not differ in their judgment.[2] We review a determination of the sufficiency of a complaint for abuse of discretion.[3] Questions regarding the admissibility of evidence are reviewed for abuse of discretion.[4] Where "the admissibility of evidence turns on whether the trial court applied the correct legal standard, we review the [lower] court's decision using our independent legal judgment."[5] We review jury instructions de novo.[6] Issues regarding the constitutionality of statutes are questions of law that we review de novo.[7] We review the interpretation of a statute de novo, adopting the rule of law most persuasive in light of precedent, reason, and policy.[8]

## IV. DISCUSSION

### A. The Trial Court Did Not Err in Granting Brown's Motion for a Judgment Notwithstanding the Verdict After the Original Trial.

■ Following completion of the original jury trial, and after the jury had entered its finding that Freeman's intoxication was not a legal cause of Eason's death, the superior court granted Brown's motion for a judgment notwithstanding the verdict (JNOV). L.D.G. argues that Brown was not entitled to a j.n.o.v. because reasonable persons could differ in their judgment on the issue, and therefore the jury's verdict should have been allowed to stand. To support this argument, L.D.G. asserts that Alaska's dram shop liability statutes are not strict liability statutes, and therefore the plaintiff must establish that violation of the statutes was both the factual and proximate cause of the injuries. In this case, L.D.G. argues, Brown must show not just that L.D.G. violated the dram shop statutes by serving alcohol to an intoxicated person, but also that "the injuries to the decedent 'resulted from the intoxication,' or were proximately caused by the intoxication."

Brown responds that the entry of a JNOV was appropriate because the jury had been given an improper instruction on legal causation and because the special verdict form included an improper question on legal causation. Brown supports these claims by asserting that in a statutory dram shop case the only relevant issues of proximate cause are whether the defendant acted with criminal negligence under the statute in serving the actor alcohol, and whether the actor's intoxication led to the injuries. Brown argues that, because the jury returned findings in the affirmative on both of these questions, there was no need for an additional jury question on legal causation and the superior court acted appropriately in entering judgment in favor of Brown.

■ In deciding whether to issue a JNOV, a trial court must determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment.[9] Under Alaska's dram shop liability statutes, a person who provides alcohol to another is generally not liable for injuries resulting from that person's intoxication. However, the statutes provide an exception for a liquor licensee who allows an intoxicated person to consume an alcoholic beverage on licensed premises. Alaska Statute 04.21.020 provides in relevant part that

a person who provides alcoholic beverages to another person may not be held civilly liable for injuries resulting from the intoxi-

2. *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974).

3. See *Taylor v. Johnston*, 985 P.2d 460, 463 (Alaska 1999) (amendment of complaint).

4. *Yang v. Yoo*, 812 P.2d 210, 217 (Alaska 1991).

5. *Marsingill v. O'Malley*, 128 P.3d 151, 155–56 (Alaska 2006) (quoting *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 140 (Alaska 2004)).

6. *Pagenkopf v. Chatham Elec., Inc.*, 165 P.3d 634, 646 n. 50 (Alaska 2007).

7. *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 603 (Alaska 1999).

8. *Alaskans For Efficient Gov't, Inc. v. Knowles*, 91 P.3d 273, 275 (Alaska 2004).

9. *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974); see also *Kava v. American Honda Motor Co.*, 48 P.3d 1170, 1176 (Alaska 2002).

cation of that person unless the person who provides the alcoholic beverages holds a license ... or is an agent or employee of such a licensee and ... the alcoholic beverages are provided to a drunken person in violation of AS 04.16.030.

Alaska Statute 04.16.030 prohibits a licensee acting with criminal negligence from "sell[ing], giv[ing], or barter[ing]" alcoholic beverages to a drunken person" or "allow[ing] a drunken person to ... consume an alcoholic beverage within licensed premises."

Here, in its decision granting Brown's motion for a JNOV, the superior court found that "fair-minded jurors could not have concluded that the intoxication of the murderer, who they found would not have killed Tracy Eason but for that very intoxication, was not a substantial factor in this wrongful death." The superior court's decision to enter judgment in favor of Brown, therefore, was based on its determination that the jury acted unreasonably in failing to assign legal causation to the J Bar B's actions in allowing Freeman to consume alcohol when he was already intoxicated, even though the jury had already found that the J Bar B had acted with criminal negligence and that Freeman's intoxication was the factual cause of Eason's death.

■■■ Generally, Alaska courts apply a two-part test to determine legal causation in negligence cases, asking first whether the accident "would not have happened 'but for' the defendant's negligence," and then asking whether "the negligent act was so important in bringing about the injury that reasonable individuals would regard it as a cause and attach responsibility to it." [10] We have also specifically outlined the requirements for legal causation in dram shop cases in *Gonzales v. Safeway Stores, Inc.:* [11]

> Under ordinary principles of causation a plaintiff would have to prove that the liquor unlawfully sold was a substantial contributing factor to the intoxication which caused the accident. Under the dram

shop act the plaintiff has an easier task. The plaintiff must show only an unlawful sale to an intoxicated person who, in consequence of such intoxication, caused injury to another. The plaintiff need not show that the sale substantially contributed to the intoxication.[12]

Thus, the issue of legal causation in dram shop liability cases hinges on whether the actor's intoxication was so important in bringing about the injury that a reasonable person would regard it as a cause and attach responsibility to it. This is true whether or not the plaintiff has established that the intoxication resulted from the alcohol that was unlawfully provided in violation of AS 04.16.030.

In this case, the jury found both that an employee of the J Bar B acted with criminal negligence when she allowed Freeman to consume alcohol on the premises when he was already intoxicated, and that it was more likely true than not that Freeman would not have killed Eason had he not been intoxicated. The superior court also asked the jury to determine whether Freeman's intoxication was "so important in bringing about the death of Tracy Eason that a reasonable person would regard it as a cause and attach responsibility to it." The jury answered this question in the negative. The jury thus found that the first prong of the two-part substantial factor test for legal causation—"but for" causation—was satisfied, but that the second prong—whether a reasonable person would regard the defendant's negligence as a cause and attach responsibility to it—was not satisfied.[13]

■■ In granting Brown's motion for entry of judgment in his favor on the issue of liability, the superior court found that "fair-minded jurors could not have concluded that the intoxication of the murderer, who they found would not have killed Tracy Eason but for that very intoxication, was not a substantial factor in this wrongful death." We will

10. *Winschel v. Brown*, 171 P.3d 142, 148 (Alaska 2007); *see also Robles v. Shoreside Petroleum, Inc.*, 29 P.3d 838, 841 (Alaska 2001).

11. 882 P.2d 389 (Alaska 1994).

12. *Id.* at 397 (Alaska 1994) (internal citations omitted); *see also Kavorkian v. Tommy's Elbow Room, Inc.*, 711 P.2d 521, 523 (Alaska 1985).

13. *See Winschel*, 171 P.3d at 148–49.

hold that a jury's findings were unreasonable where the facts in the record do not support the jury's conclusions on legal cause.[14] A review of the record in this case supports the superior court's determination that the only reasonable conclusion in light of the evidence was that Freeman's intoxication was a substantial factor in causing Eason's death.

The jury heard testimony from several individuals who described Freeman's typical behavior when sober and when intoxicated, as well as testimony from individuals who witnessed his behavior on the night of the shooting. This testimony presented a picture of Freeman as a man who was mild mannered—if sometimes unpleasant—when sober, but who was capable of a significant "transformation" when intoxicated, becoming "obnoxious," "belligerent," and "mean as a snake."

Elizabeth and Sam Strange, Freeman's neighbors, described their relationship with Freeman prior to the attacks on Iwasko and Eason, and their shock at the changes they observed in Freeman that night. Elizabeth recounted their friendly relationship with Freeman, noting that he was like "a dad to us and a grandfather to our children." Elizabeth further stated that Freeman had never given her any indication that he was a violent person when he was sober. Sam Strange was the first person to arrive at Freeman's residence immediately following the shootings, and both his testimony and the transcript of his call to 911 that night reflect his shock at Freeman's condition and behavior. Strange had run over to the Freeman residence believing that there had been an accident and intending to help, but called 911 after Freeman, who still held the handgun and who had blood on his hand, threatened to shoot him. In the recording of that 911 call, which was played at trial, Strange tells the 911 operator that "[h]e's drunker than a rail right now," and "I've never seen this man like this before," and that "this is totally out of context for him that I know of." At trial, Sam answered "Yes" to the question "So . . . the drunkest you ever saw him was also the

wildest and most violence [sic] you ever saw him?"

Three bartenders who had worked at the J Bar B and knew Freeman described—in statements either given directly at trial or recounted at trial by the lead investigator in Freeman's criminal case—Freeman's "belligerent," "mean," and sometimes violent behavior when he was intoxicated. Two of these bartenders had personal policies of *never* serving liquor to Freeman because they did not like his behavior when he consumed hard alcohol. Freeman was served at least eight drinks at the J Bar B, including hard alcohol, the night of the shooting. The state troopers administered a portable breath test to Freeman after he was arrested and recorded a breath alcohol level of 0.203.

The question put to the jury was whether Freeman's intoxication was "so important in bringing about the death of Tracy Eason that a reasonable person would regard it as a cause and attach responsibility to it." The jury heard evidence that Freeman underwent significant changes in his personality when he became intoxicated, and that these changes involved increased belligerence and aggression. Although the evidence presented to the jury did not show that Freeman's intoxication was the sole cause of the death of Tracy Eason, the only reasonable conclusion in light of the evidence was that Freeman's intoxication was sufficiently important in bringing about Eason's death that responsibility should be attached to the intoxication and, by extension, to those who unlawfully contributed to the intoxication.[15]

Additionally, there is evidence that the jury may have been exposed to incorrect statements regarding the legal standards for dram shop liability, and that the jury's resulting confusion led to the inconsistency in its findings on the special verdict form. Although jury instruction 22 provided an accurate summation of dram shop liability, including a statement that it was not necessary for the jury to find that the particular alcoholic beverages served to Freeman at the J Bar B in violation of the statute led to Eason's

---

**14.** *McCarthy v. McCarthy*, 753 P.2d 137, 138 (Alaska 1988) (holding that it was unreasonable for jury to find that defendant's negligence in pulling out of parking lot without stopping was

not legal cause of collision with car pulling into parking lot).

**15.** *See Winschel*, 171 P.3d at 148.

injuries, the jury had already heard an inconsistent, and inaccurate, statement of the law from L.D.G.'s counsel. L.D.G. included in its summation to the jury, over Brown's objection, the rhetorical question "Do we know whether or not that extra two or three drinks that [Freeman] had at the J Bar B was what did it?" This statement was contrary to our holding in *Gonzales*—that the plaintiff need not show that the alcohol that was provided with criminal negligence substantially contributed to the intoxication[16]—and raised the irrelevant question of whether the alcohol that Freeman consumed after he was cut off contributed to his decision to murder Eason. In light of this exposure to an incorrect legal standard, it is understandable that the jury could find both that it was "more likely true than not true that, if [Freeman] had not been intoxicated, he would not have killed [Eason]" and that Freeman's intoxication was not "so important in bringing about the death of [Eason] that a reasonable person would regard it as a cause and attach responsibility to it." However, where the evidence in the record does not support the jury's findings on legal causation it is "not necessary to speculate as to why the jury went wrong."[17]

Therefore, because the jury found that L.D.G. acted with criminal negligence in serving alcohol to an intoxicated individual and that Freeman's intoxication was a "but for" cause of Eason's death, and because the superior court did not err in finding that reasonable jurors could not have concluded that Freeman's intoxication was not a substantial factor in Eason's death, the superior court did not err in entering j.n.o.v. in favor of Brown.[18]

**B. The Trial Court Did Not Err in the Trial on Damages in Refusing To Admit Evidence Relating to the Circumstances of Eason's Death.**

 After the jury failed to allocate legal liability in its special verdict form—therefore avoiding the question of damages—and the court issued judgment notwithstanding the verdict assigning liability to L.D.G., the superior court ordered a separate trial to determine damages. L.D.G. argues on appeal that the trial court erred in refusing at the damages trial to admit evidence pertaining to facts and circumstances relevant to Eason's death and to L.D.G. and its business practices.

At the start of the trial on damages the superior court ruled that it would allow only evidence relevant to determining wrongful death damages and that it would not allow evidence relevant only to issues of legal liability. The superior court based this decision on its conclusion that L.D.G.'s legal liability had already been determined and that L.D.G. could not now escape the implications of its decision not to join Freeman, the individual arguably most responsible for Eason's death, as a third-party defendant. L.D.G. objected to this ruling at trial, asserting two primary arguments. First, L.D.G. asserted that it was important for the jury to know that it was Freeman who shot and killed Eason. Second, L.D.G. again attempted to assert its interpretation that dram shop liability only applies to the sale of alcohol (but not to allowing an intoxicated person to consume alcohol) and, accordingly, renewed its argument that "the alcohol consumed by Mr. Freeman was legally sold to him as far as the jury's verdict was concerned."[19]

On appeal, L.D.G. argues that the superior court erred in refusing to allow it to present any evidence pertaining to the particular circumstances of Eason's death, thus "forcing the jury to make a determination in a vacuum as to what damages were appropriate as a natural and proximate cause of defendant L.D.G.'s wrongful conduct." L.D.G. also implicitly raises the issue of Freeman's liability

**16.** 882 P.2d at 397; *see also Kavorkian*, 711 P.2d at 523.

**17.** *McCarthy*, 753 P.2d at 139.

**18.** *See Winschel v. Brown*, 171 P.3d at 142, 148 (Alaska 2007).

**19.** The jury, on the special verdict form, declined to find that "an employee of the J Bar B [sold] alcohol to R.V. Freeman with criminal negligence when he was a drunken person," but did find that "an employee of the J Bar B with criminal negligence allow[ed] R.V. Freeman to consume an alcoholic beverage in the bar when he was a drunken person."

by noting that the superior court's decision meant that the jury would not hear evidence "concerning the circumstances surrounding the shooting by Freeman ..., as well as the circumstances leading up to Freeman's criminal act."

 Under Alaska Rule of Evidence 402, "[e]vidence which is not relevant is not admissible." We review a trial court's admission or exclusion of evidence for abuse of discretion.[20] Where "the admissibility of evidence turns on whether the trial court applied the correct legal standard, we review the [lower] court's decision using our independent legal judgment."[21] Here, the superior court's decision to exclude evidence pertaining to Freeman's role in Eason's death was based, in part, on its interpretation of the law controlling the apportionment of damages. Therefore, because the superior court's decisions on the admissibility of evidence relating to the circumstances of Eason's death involved questions of law, we review those decisions de novo.

Although L.D.G. appears to believe that the details of Freeman's role in the death of Eason are relevant to the jury's determination of the damages owed by L.D.G., L.D.G. failed to show that the evidence was relevant. At trial, the superior court refused to admit this evidence because of L.D.G.'s failure "to name the murderer as a third-party defendant." Alaska Statute 09.17.080 provides for the apportionment of damages in actions involving the fault of more than one person, but specifically prohibits allocating fault to a "person ... identified as a potentially responsible person" if "the parties had a sufficient opportunity to join that person in the action but chose not to."[22] This statute requires that "[i]n order to include a non-party in the fault allocation, a defendant must iden-

tify the non-party as someone who the defendant will argue is at fault" and that "even if the defendant argues that a non-party was at fault, that non-party cannot be included in the allocation of fault if there was a 'sufficient opportunity' to join that non-party."[23] A "sufficient opportunity" is found where the non-party is "(A) within the jurisdiction of the court; (B) not precluded from being joined by law or court rule; and (C) reasonably locatable."[24]

Here, L.D.G. never attempted to bring Freeman into this lawsuit through joinder and never argued that it did not have a sufficient opportunity to join Freeman because he fell into any of the three statutory categories.[25] Because L.D.G.'s liability for Eason's death was established at the original trial, evidence pertaining to Freeman's role in Eason's death would not be relevant to the issue of damages unless L.D.G. were seeking to apportion damages to Freeman. But L.D.G. did not take the required steps to ensure that damages could be apportioned to Freeman. Accordingly, the superior court did not err in ruling that evidence of Freeman's role in Eason's death would not be admitted at the trial on damages.

 L.D.G. next argues that evidence pertaining to the facts of Eason's death and L.D.G.'s actions in serving Freeman is admissible because it is relevant to Alaska's wrongful death statute, AS 09.55.580. That statute limits damages to "the natural and proximate consequence of the negligent or wrongful act or omission of another."[26] L.D.G. argues that this provision raises anew the question of the scope of L.D.G.'s liability. L.D.G. also argues that the statute's instruction that "the court or jury shall consider all the facts and circumstances and from them

---

20. *Yang v. Yoo*, 812 P.2d 210, 217 (Alaska 1991).

21. *Marsingill v. O'Malley*, 128 P.3d 151, 155–56 (Alaska 2006) (quoting *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 140 (Alaska 2004)).

22. AS 09.17.080(a)(2).

23. *Evans ex rel Kutch v. State*, 56 P.3d 1046, 1060 (Alaska 2002) (quoting AS 09.17.080(a)(2) (emphasis in original)).

24. AS 09.17.080(a)(2).

25. At the time of the hearing Freeman was incarcerated in Arizona and was therefore locatable. Freeman was subject to long arm service under AS 09.05.015(a)(3) because all actions at issue in this case occurred within Alaska. Brown never showed that Freeman could not be joined.

26. AS 09.55.580(b).

fix the award"[27] essentially opens the door to any evidence relating to the negligent or wrongful act. Essentially, this comes down to a question of whether the wrongful death statute requires an inquiry into the underlying facts of the events that led up to the decedent's death—including a renewal of questions of actual and proximate causation—or whether the inquiry indicated by the statute is limited to exploring aspects of the life of the decedent and of any surviving dependents that could be relevant to setting damages.

In defense of the first theory, L.D.G. cites three cases from other jurisdictions where courts purportedly admitted evidence on the circumstances and facts surrounding an accident even after the defendant had admitted liability. None of the cases cited by L.D.G. are analogous to the question at issue, however, because in all three cases the amount of damages awarded depended on the nature and extent of the injuries received and the admitted testimony was specifically relevant to those injuries. In *Long v. Yellow Cab Co.*,[28] the court ruled that evidence of the details of a car accident were admissible where the defendant taxi operator disputed that the plaintiff's injury was caused by the accident;[29] in *Riordan v. Gould Engineering, Inc.*,[30] the court ruled that evidence of the pain and suffering a decedent husband experienced when he suffocated after being buried in a construction accident was relevant to his wife's suit for damages and therefore was admissible;[31] and in *Piper v. Barber Transportation Co.*,[32] the court ruled that in a suit resulting from an automobile accident evidence of the force of impact and the character of the plaintiff's injury were relevant and admissible where the plaintiff sought damages for pain and suffering.[33]

In this case, in contrast, the evidence that L.D.G. sought to admit was not relevant to the damages sought by Brown. The damages Brown sought, on behalf of Eason's surviving dependents, were economic damages and the dependents' non-economic damages for past and future loss of "society, comfort, care, protection, affection, and companionship of Tracy Eason," and for "sorrow, mental distress, and grief suffered as a result of the death of Tracy Eason." The wrongful death statute directs juries, in fixing the amount of damages, to consider (1) deprivation of the expectation of pecuniary benefits, (2) loss of contributions for support, (3) loss of assistance or services, (4) loss of consortium, (5) loss of prospective training and education, and (6) medical and funeral expenses.[34] None of these claims or elements requires any consideration of the nature of Eason's injuries or of any of the events leading up to her death.

Instead, L.D.G. appears to have sought introduction of the evidence in order to relitigate questions of causation, including the degree to which the actions of L.D.G.'s representative—allowing Freeman to consume the remaining portions of his drinks—contributed to Eason's death. Because the jury and trial court had already determined legal cause and established L.D.G.'s liability in the original trial, and because there was no reason for the jury in the trial on damages to be informed of the specific role L.D.G. played in bringing about Eason's death, the superior court did not err in excluding evidence pertaining to the circumstances of Eason's death from the trial on damages.

### C. The Trial Court Did Not Err in the Trial on Damages in Instructing the Jury on Legal Cause.

▮ In an extension of its argument regarding the admissibility of evidence under

27. AS 09.55.580(c).

28. 137 Ill.App.3d 324, 92 Ill.Dec. 99, 484 N.E.2d 830 (1985).

29. *Id.* at 833.

30. 74 Mich.App. 292, 253 N.W.2d 736 (1977).

31. *Id.* at 738.

32. 79 S.D. 353, 112 N.W.2d 329 (1961).

33. *Id.* at 335–36.

34. AS 09.55.580(c). While it is true that the factors listed are not exclusive, *id.*, the jury is required to consider the facts and circumstances relating to "fixing the amount of damages." *Id.* The evidence L.D.G. sought to admit did not concern damages; it concerned causation.

the wrongful death statute, L.D.G. also argues that the superior court erred in giving an abridged instruction on legal cause at the trial on damages. At trial, the court instructed the jury:

> For each item of claimed loss, you must decide whether it is more likely true than not true that the beneficiary—that is the children—had such a loss or are reasonably probable to have such a loss in the future; and two, that the loss was legally caused by the death of Tracy Eason.... If one or both of these things are not true with respect to a particular item of loss, you may not make an award for that loss.

L.D.G. requested at trial that the jury receive a different instruction on cause identified only as "the Alaska civil jury pattern instruction and the definition of legal cause of death."

There was no need for the jury to receive a full instruction on legal cause because the issue of L.D.G.'s liability for Eason's death was not before the jury in the damages trial. Before instructing the jury on the legal requirements for determining damages, the superior court stated that "L.D.G., Inc. is legally responsible for the death of Tracy Eason." The wrongful death statute requires that any damages awarded under the statute be "those which are the natural and proximate consequence of the negligent or wrongful act or omission of another." [35] The only questions for the jury, then, were whether the children had suffered harm and whether Eason's death was the legal cause of that harm such that an award of damages against the party already determined to be legally responsible for that death would be justified. Because the instruction on legal cause given by the superior court was sufficient to allow the jury to make this determination, the superior court did not err in declining to give a more extensive instruction on legal cause.

## D. It Was Error To Grant Gjovig's Motion for a Directed Verdict.

■ Brown cross-appeals, challenging the trial court's directed verdict on the issue of Gjovig's personal liability. Gjovig argued that there was insufficient evidence to show that L.D.G.'s corporate form had been abused such that the corporate veil should be pierced and Gjovig, L.D.G.'s sole shareholder, should be held personally liable. Deciding that there was insufficient evidence to support an argument for piercing the corporate veil, the superior court granted Gjovig's motion for a directed verdict. [36]

Before reaching the merits of the piercing issue, the superior court considered two preliminary issues: whether Brown's failure to plead the piercing issue foreclosed his right to argue it at trial, and whether Gjovig's status as a partner to the corporation negated the need for Brown to pierce the corporate veil. We consider these issues in turn.

### 1. Failure to plead the piercing theory

The superior court, in its ruling on Gjovig's motion for a directed verdict, noted that Brown did not plead piercing the corporate veil as a count in the complaint. As Brown argues, that deficiency alone is not sufficient to keep the question from going to the jury. We have previously held, in allowing a party to proceed on a piercing the corporate veil theory after originally bringing suit on a de facto partnership theory, that "if a party has notice of the conduct for which the opposing party is seeking relief, the opposing party may recover under any theory supported by the evidence." [37] Here, Brown indicated in early December 2002, six months before the start of trial, that he was prepared to argue that L.D.G.'s corporate veil should be pierced in order to hold Gjovig personally liable. Brown submitted supplemental proposed jury instructions, including two instructions pertaining to piercing the corporate veil, accompanied by a notice indicating that al-

---

**35.** AS 09.55.580(b).

**36.** It does not appear that the court ever issued a written order regarding the dismissal of the claims against Gjovig personally, and the court's final order does not contain any mention of this

issue. Both parties treat the superior court's ruling on the issue at the hearing as a final order.

**37.** *McCormick v. City of Dillingham*, 16 P.3d 735, 743 (Alaska 2001).

though Brown maintained his theory that Gjovig was liable as a partner or joint-venturer of L.D.G., he would also argue that the corporate veil should be pierced. L.D.G. and Gjovig, therefore, were on sufficient notice of Brown's piercing the corporate veil theory.

## 2. Gjovig's liability as a partner

Brown argues that Gjovig can be held personally liable as a partner to L.D.G. whether or not L.D.G.'s corporate veil is pierced. But Brown's theory that Gjovig can be held personally liable as a partner of L.D.G. mischaracterizes Gjovig's relationship with L.D.G. It is not disputed that Gjovig is the sole shareholder of L.D.G., a subchapter S corporation,[38] and that L.D.G. is the owner of the J Bar B. To overlook this fact and proceed under the theory that Gjovig may nevertheless be held liable for the actions of the corporation as a partner would be to do violence to the concept that a sole shareholder normally has only very limited liability for the debts of the corporation. We have previously affirmed the decision of a superior court that applied the standards for piercing the corporate veil to a claim that was originally brought under a de facto partnership theory.[39] The facts which Brown alleges in support of his argument that Gjovig and L.D.G. were engaged in a partnership—including that Gjovig did not honor the formalities of L.D.G.'s corporate form, paid wages and salaries of J Bar B employees out of his own pocket, and intermingled corporate and non-corporate funds, and that the corporation was undercapitalized—should therefore be considered under the standards for piercing the corporate veil. We now turn to the merits of that issue.

## 3. Piercing the corporate veil

This issue comes to us on the superior court's grant of Gjovig's motion for directed verdict. When reviewing the grant of a motion for a directed verdict we must "determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable [persons] could not differ in their judgment."[40] If there is room for diversity of opinion among reasonable persons, then the question is one for the jury to decide and a directed verdict is not appropriate.[41]

In general, courts seek to recognize and uphold "the principles that the corporation exists as a separate legal entity and that owner liability for the debts of the corporation is limited."[42] Courts therefore exhibit a preference against piercing the corporate veil and will do so only in exceptional circumstances.[43]

The corporate veil, however, may be pierced "if the corporate form is used to defeat public convenience, justify wrong, commit fraud, or defend crime"—a misconduct standard.[44] In addition, in *Uchitel Co. v. Telephone Co.*,[45] we also recognized that the corporate veil may be pierced when a corporation is nothing more than a "mere instrument" of a shareholder, and we laid out six primary factors to evaluate the rationality of imposing personal liability on the shareholder.[46] Under this mere instrument test,

**38.** Under the federal Internal Revenue Code, a subchapter S corporation is exempt from corporate income tax because net profits and net losses are passed directly on to the corporate shareholders. 26 U.S.C.A. Subt. A, Ch. 1, Subch. S.

**39.** *McCormick*, 16 P.3d at 743.

**40.** *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974).

**41.** *Id.* at n. 12.

**42.** *Pyramid Printing Co. v. Alaska State Comm'n for Human Rights*, 153 P.3d 994, 1000 (Alaska 2007).

**43.** *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003)

(noting that "[t]he doctrine of piercing the corporate veil ... is the rare exception, applied in the case of fraud or certain other exceptional circumstances").

**44.** *Id.* (quoting *Elliott v. Brown*, 569 P.2d 1323, 1326 (Alaska 1977)).

**45.** 646 P.2d 229 (Alaska 1982).

**46.** *Id.* at 235. In *Jackson v. General Elec.*, 514 P.2d 1170 (Alaska 1973) we first used the multi-factor test for mere instrumentality in the parent-subsidiary context; in *Uchitel* we imported that test into the corporation-shareholder context to create a disjunctive test for piercing the corporate veil. *See also Nerox Power Sys., Inc. v. M–B Contracting Co.*, 54 P.3d 791, 801–02 (Alaska

we ask whether (a) the shareholder sought to be charged owns all or most of the stock of the corporation; (b) the shareholder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (c) the corporation has grossly inadequate capital; (d) the shareholder uses the property of the corporation as his own; (e) the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; and (f) the formal legal requirements of the corporation are observed.[47] "It is not necessary for all six factors to be satisfied before instrumentality can be found," but the factors help the fact-finder to decide whether the evidence favors piercing the veil.[48]

Viewing the evidence in the light most favorable to Brown, reasonable inferences can be drawn that are sufficient to create a jury question under either veil-piercing theory. A reasonable fact-finder could infer that Gjovig (1) was the sole shareholder and officer of L.D.G.; (2) did not honor the formalities of L.D.G.'s corporate form, but paid employees out of his own pocket and apparently under the table;[49] (3) commingled personal and corporate funds, not only by using personal funds to pay employees but also by apparently taking corporate money for personal use without accounting for it;[50] (4) undercapitalized L.D.G., as demonstrated by his payment of employees out of his own pocket, his evident failure to obtain insurance to cover adverse judgments, and his taking corporate money for personal use without accounting for it;[51] (5) manipulated the actual business in and out of the corporate form to both avoid tax laws and make sure that potential claimants against the bar operations would be unable to obtain a satisfiable judgment;[52] and (6) hid behind L.D.G.'s corporate form to try to avoid liability for his employees' dram shop violations.

These inferences would satisfy several of the instrumentality factors, and would therefore be sufficient to create a jury question on whether L.D.G. was a "mere instrument" of Gjovig to the extend that L.D.G.'s corporate form should be disregarded.[53] The inferences regarding manipulations of the corporate form to avoid taxes, enforceable judgments, and employer liability are also sufficient to create a jury question on whether Gjovig violated the misconduct standard—that is, whether he used the cor-

---

2002) (referring to mere instrument test as "an alternate theory of personal liability" to misconduct standard); Philip Reed Strauss, *Control and/or Misconduct: Clarifying the Test for Piercing the Corporate Veil in Alaska*, 9 Alaska L.Rev 65 (1992) (describing some vacillation between our disjunctive and conjunctive applications of the two tests, and concluding that disjunctive treatment—that the tests are distinct ways to justify piercing the corporate veil—is the most appropriate choice on both precedent and policy grounds).

47. *Uchitel*, 646 P.2d at 235.

48. *Nerox Power*, 54 P.3d at 802. *See also McCormick v. City of Dillingham*, 16 P.3d 735, 744–45 (Alaska 2001) (upholding lower court's decision to pierce corporate veil even though first factor was not satisfied and fifth factor was not directly addressed); *Murat v. F/V Shelikof Strait*, 793 P.2d 69, 76–77 (Alaska 1990) (considering possibility that instrumentality could be found on basis of only two out of six factors, but ultimately declining to pierce veil because of inadequate facts).

49. Some of the bar employees had never heard of L.D.G. Some employees never saw a W–2 form until after the litigation was initiated. Gjo-

vig admitted in testimony that he paid employees with cash out of his personal pocket.

50. Gjovig testified that he received a $30,000 annual salary from L.D.G., but it was not reflected on the corporate tax return for 1998. That corporate tax return showed total salaries of under $10,000, although Gjovig testified that the bar was open every day of the year except Christmas.

51. *See supra* notes 50–51.

52. For example, Gjovig testified that he "leased" the restaurant portion of his facility to his girlfriend, who paid no rent for the alleged lease. But the bartender testified that there was only one cash register and patrons of the restaurant could order drinks from the bar. Gjovig testified that the reason L.D.G. did not show more income and expenses on its tax returns was because someone else owned the restaurant business. But that was contradictory to L.D.G.'s liquor license and statements of business on L.D.G.'s tax return.

53. *See Uchitel Co. v. Telephone Co.*, 646 P.2d 229, 234 (Alaska 1982).

porate form of L.D.G. "to defeat public convenience, justify wrong, commit fraud, or defend crime."[54] The trial court concluded that the evidence presented by Brown was "never really tied together in any kind of coherent theory that a jury could chew on in any reasonable way according to standards," but the jury instructions proffered by Brown on piercing the corporate veil combined with closing arguments could have cured that perceived defect.

We conclude that the issue of piercing the corporate veil was properly before the superior court and that there was sufficient evidence for the question to go to the jury. It was therefore error to grant Gjovig's motion for directed verdict and to dismiss him from the lawsuit. We remand for jury trial on Brown's claim that the corporate veil should be pierced and Gjovig subjected to personal liability.

**E. The Trial Court Did Not Abuse Its Discretion in the Original Trial in Finding that the Complaint Was Sufficiently Broad To Allow the Jury To Determine Whether L.D.G. Was Liable for Allowing an Intoxicated Person To Consume Alcohol.**

 L.D.G. argues that Brown's complaint alleged only that L.D.G. served alcohol to Freeman in violation of the dram shop statute, and that it was therefore error for the superior court to allow the jury to receive instruction and consider liability on the issue of whether L.D.G. violated the dram shop statute in allowing Freeman to consume alcohol on the bar's premises while he was visibly intoxicated. Brown's amended complaint alleged that "defendants through their agents or employees, including Sharine Christensen,

served alcoholic beverages to a drunken person, one Robert Freeman, who was obviously and visibly intoxicated," and that this action "violated AS 04.16.030." Alaska Statute 04.16.030 prohibits certain conduct relating to drunken persons, including:

(a) A licensee, an agent, or employee may not with criminal negligence

(1) sell, give, or barter alcoholic beverages to a drunken person;

. . .

(3) allow a drunken person to enter and remain within licensed premises or to consume an alcoholic beverage within licensed premises.

At trial, L.D.G. objected to the jury instruction pertaining to dram shop liability, arguing that "there's nowhere ... in the plaintiff's complaint where they allege that L.D.G., Inc., and J Bar B are liable because they allowed Freeman to consume alcoholic beverages when he was a drunken person on the premises."[55] The superior court ruled at trial that it would allow the instruction on the consumption theory of dram shop liability, finding that the complaint was "sufficiently broadly pleaded to reach all forms of provision under AS 04.16.030."[56] Jury instruction 22 included instructions on dram shop liability for both selling alcoholic beverages to a drunken person and for allowing a drunken person to consume an alcoholic beverage in the bar. The special verdict form included separate questions on whether an employee of the bar sold alcohol to Freeman when he was a drunken person and whether an employee of the bar allowed Freeman to consume an alcoholic beverage in the bar when he was a drunken person. L.D.G. now argues that it was prejudiced by the inclusion of this jury instruction and separate special verdict questions because the jury found that

---

54. *Id.* at 234–35.

55. L.D.G. further objected to this jury instruction at trial on the theory that the exceptions to the dram shop immunity statute did not include violations for allowing a drunken person to consume alcohol on the premises, but L.D.G. does not renew that specific objection on appeal. We have held that the exceptions to the dram shop immunity statute, AS 04.21.020(a), include any violation of AS 04.16.030. *See Gonzales v. Krueger,* 799 P.2d 1318, 1320 (Alaska 1990) (holding that "AS 04.21.020 does not immunize vendors who violate AS 04.16.030") (quoting

*Williford v. L.J. Carr Invs.,* 783 P.2d 235, 239 (Alaska 1989)).

56. L.D.G., in its appeal, categorizes the superior court's action as "permitting Brown to amend his complaint to allege liability," but this argument mischaracterizes the court's action. Brown never moved to amend his complaint. Instead, the court responded to L.D.G.'s objection to the jury instruction on dram shop liability by ruling that the complaint was sufficiently broad.

L.D.G. did not sell alcohol to Freeman when he was a drunken person but did find that L.D.G. allowed Freeman to consume alcohol on the premises when he was a drunken person.

■ We review superior court decisions regarding the sufficiency of a complaint for abuse of discretion.[57] We have held that courts should construe complaints liberally under the theory that "a party should be granted the relief to which he is entitled under the evidence, regardless of the theory of his pleadings."[58] This is because "the complaint's function is to put the opposing party on notice of the nature of the claim being asserted, leaving it to discovery and other pretrial procedures to narrow the issues."[59] Here, Brown's complaint alleged a violation of AS 04.16.030 without specific citation to any particular subsection. Although the complaint did reference Christensen's actions in "serv[ing] alcoholic beverages to a drunken person," this language is not so tailored to AS 04.16.030(a)(1) ("sell, give, or barter alcoholic beverages to a drunken person") that it would preclude additional consideration of liability under AS 04.16.030(a)(3) ("allow a drunken person to . . . consume an alcoholic beverage within licensed premises"). Therefore, L.D.G. was on sufficient notice that Brown was alleging violation of AS 04.16.030, including the prohibition against allowing a drunken person to consume alcohol on a licensee's premises. Accordingly, the superior court did not err in finding that the complaint was sufficiently broad to permit the jury to determine liability on the consumption theory of dram shop liability.

**F. The Trial Court Did Not Abuse Its Discretion in the Trial on Damages by Admitting Hearsay Testimony Relating to Non–Economic Damages.**

■ The trial court admitted hearsay testimony, over L.D.G.'s objection, regarding Eason's plans for spending time with her children in the future and testimony regarding statements made by Eason's children about their feelings toward their mother. L.D.G. argues that it was error to admit this hearsay testimony as evidence of the non-economic damages claimed by Eason's children at the trial on damages. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[60] Hearsay is not admissible unless it falls within a specific exception.[61] A hearsay statement is admissible if it is "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) offered to prove the declarant's present condition or future action."[62]

All of the challenged testimony falls within a hearsay exception. The boys' grandfather, Robert Brown, testified about Eason's current custody arrangements for her sons and her plans for the future. Brown testified that Tracy Eason was divorced from the boys' father, Terry Eason, and that Justin lived with his father in Oregon while Jordan had lived with his mother in Oregon prior to her move to Alaska. Eason had moved to Alaska from Oregon without Jordan approximately three weeks before her death. Brown testified about Eason's hopes and plans regarding how this move would affect the amount of contact she had with her sons: "Her plans was to get herself established, get a house, and then go back down and get Jordan. And then they would have swapped custody back and forth after that. I think it was they was figuring on Justin coming up in the summer when he wasn't in school." L.D.G. objected to this testimony as hearsay, and the superior court overruled the objection. Brown's wife, Goldie Brown, the boys'

57. *See Taylor v. Johnston*, 985 P.2d 460, 463 (Alaska 1999).

58. *Griffith v. Taylor*, 937 P.2d 297, 307 (Alaska 1997) (quoting *Brayton v. City of Anchorage*, 386 P.2d 832, 833 (Alaska 1963)).

59. *Id.* (internal quotation omitted).

60. Alaska R. Evid. 801.

61. Alaska R. Evid. 802.

62. Alaska R. Evid. 803(3).

grandmother, also testified about her conversations with Eason regarding Eason's plans for custody and visitation with Justin and Jordan. L.D.G. objected to this testimony as well. The superior court did not abuse its discretion in overruling L.D.G.'s objection because the Browns' testimony regarding Eason's statements about her plans for future visitation with her children was admissible as a statement of Eason's "then existing state of mind" regarding her "intent" and "plan[s]." [63] Because all of the testimony that L.D.G. challenges as inadmissible hearsay falls clearly within a hearsay exception, the superior court did not abuse its discretion in permitting the testimony at trial.

### G. The Superior Court Did Not Err in Applying a Single Damages Cap to the Aggregate Non–Economic Damages Award of Both Surviving Dependents.

The jury in the damages trial returned a verdict awarding each boy economic damages and each boy $565,798 in non-economic damages. L.D.G. then moved to impose a single damages cap under AS 09.17.010 to the combined awards for total aggregate non-economic damages of $421,824 ($8,000 multiplied by 52.728 years, Eason's life expectancy at the time of her death), split between the two boys. Brown responded by arguing that the statutory damages cap is unconstitutional as a denial of the right to trial by jury and a violation of equal protection. Brown also argued that the statute, if constitutional, should be applied in this case as a separate cap on the non-economic damages awarded to each boy. In the alternative, Brown argued, the provision of the damages cap statute providing a cap of one million dollars to cases of "severe permanent physical impairment" should apply in this case. The superior court found that the damages cap under AS 09.17.010(b) applied in this case and that

the statute imposed a single cap on all non-economic damages arising from Eason's death. The superior court also determined that Brown had not met his burden of establishing that the statute violated the constitution.

After Brown moved for reconsideration, the court ultimately reaffirmed its holding that the statute is constitutional, both on its face and as applied. The superior court then entered a single award for both boys for non-economic damages of $421,824.

### 1. The statutory damages cap on wrongful death recovery is not unconstitutional on its face as a denial of the right to trial by jury.

Brown renews, on appeal, his argument that AS 09.17.010, the damages cap statute, is unconstitutional on its face as a denial of the right to trial by jury. Article I, section 16 of the Alaska Constitution provides:

> In civil cases where the amount in controversy exceeds two hundred fifty dollars, the right of trial by a jury of twelve is preserved to the same extent as it existed at common law. The legislature may make provision for a verdict by not less than three-fourths of the jury and, in courts not of record, may provide for a jury of not less than six or more than twelve.

The non-economic damages statute, AS 09.17.010(b), provides:

> Except as provided under (c) of this section, the damages awarded by a court or a jury under (a) of this section for all claims, including a loss of consortium claim, arising out of a single injury or death may not exceed $400,000 or the injured person's life expectancy in years multiplied by $8,000, whichever is greater.

We have previously held, in *Evans ex rel. Kutch v. State*,[64] that the cap on non-econom-

**63.** *Id.* L.D.G. also made a hearsay objection to a question for Robert Brown submitted by one of the jurors that asked about "[w]hat memories does Jordan have of his mother." L.D.G. and the court had a prolonged discussion regarding the hearsay rule, and the court overruled the objection. Brown was then asked "Do you have any way of knowing what memories Jordan has of his mother?" Brown answered "No, because

he don't talk to me about it." There was no prejudice to L.D.G. because Brown did not testify as to any statements made to him by Jordan regarding his memories of or feelings toward his mother.

**64.** 56 P.3d 1046 (Alaska 2002).

ic damages under AS 09.17.010 is facially constitutional.[65] In *Evans*, a group of injured parties contemplating tort action sought a judgment from the superior court declaring the 1997 tort reform legislation—including the cap on non-economic damages at issue in the present case—to be unconstitutional on its face.[66] The superior court declined to make that finding and instead granted summary judgment in favor of the state.[67] A four-justice panel of this court heard the appeal and, in a divided opinion, affirmed the superior court's ruling.[68] The controlling opinion held that "[t]he decision to place a cap on damages awarded is a policy choice and not a re-examination of the factual question of damages determined by the jury."[69] An evenly divided decision by this court results in an affirmance,[70] but that decision is not binding in future cases.[71] A full court revisited the issue in *C.J. v. State*,[72] where the cap on non-economic damages for wrongful death was upheld against a constitutional attack.[73]

Brown argues that the damages cap statute violates the right to jury trial because "[t]he jury's factual finding that a plaintiff is entitled to recover damages is meaningless unless the plaintiff can collect those damages," and "depriving a litigant of that to which a jury has determined him to be entitled in a civil action, by legislative fiat," is not consistent with the constitutional guarantee of the right to jury trial. But that argument is foreclosed by our decisions in *Evans* and *C.J.*

The state, as intervenor, proposes another reason that the common law right to trial by jury incorporated by the Alaska Constitution does not apply to the damages cap in this case: Wrongful death actions are statutorily created and have traditionally included limits on the amounts that are recoverable. The Alaska Constitution provides that "the right of trial by a jury of twelve is preserved to the same extent as it existed at common law."[74] But the right to recovery for a wrongful death did not exist in the common law and is instead a creature of statute.[75] We have held that "[n]o right to trial by jury attaches to an action for a statutory remedy unless the statute so provides or the statutory remedy is a codification of a common law remedy."[76] Brown argues that the guarantee of a right to trial by jury applies to statutorily created causes of action for money damages to the same extent it applies under the common law. To support this argument Brown adopts an overbroad interpretation of our holding in *Loomis Electronic Protection, Inc. v. Schaefer.*[77]

In holding that the plaintiffs who brought suit under the statutorily created cause of action for employment discrimination were entitled to a trial by jury, the *Loomis* court held that the legislature had drafted the statute to be "analogous to a number of tort actions recognized at common law," and, therefore that the plaintiffs were entitled to recover "the traditional form of relief offered in the courts of law."[78] But there is no indication in the present case that the legislature intended recovery for wrongful death actions to be analogous to other tort actions. Indeed, Alaska's first wrongful

65. *Id.* at 1049.

66. *Id.* at 1048.

67. *Id.*

68. *Id.* at 1049, 1070.

69. *Id.* at 1051.

70. See *Ward v. Lutheran Hosps. & Homes Soc'y of America, Inc.*, 963 P.2d 1031, 1037 n. 11 (Alaska 1998).

71. See *City of Kenai v. Burnett*, 860 P.2d 1233, 1239 n. 11, 1246 (Alaska 1993) (Compton, J., concurring).

72. 151 P.3d 373 (Alaska 2006).

73. *Id.*

74. Alaska Const., art. 1, § 16.

75. See *In re Estate of Maldonado*, 117 P.3d 720, 724 (Alaska 2005).

76. *Fairbanks N. Star Borough Sch. Dist. v. Duncan*, 878 P.2d 641, 641 (Alaska 1994).

77. 549 P.2d 1341 (Alaska 1976).

78. *Id.* at 1344 (quoting *Curtis v. Loether*, 415 U.S. 189, 194–96, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974)).

death statute—enacted by the territorial legislature in 1900—limited recoverable damages to $10,000.[79] The territorial legislature amended this statute in 1955, but retained a damages cap of $50,000.[80] Although the wrongful death statute itself no longer directly incorporates a damages cap,[81] AS 09.17.010 now serves the same function. Accordingly, the constitution's incorporation of the common law right to a trial by jury does not apply to the application of the damages cap to a statutorily created cause of action under the wrongful death act.

We reaffirm our holdings in *Evans* and *C.J.* that the non-economic damages cap does not violate the constitutional right to a trial by jury. A damages cap does not intrude on the jury's fact-finding function because the cap represents a policy decision that is applied after the jury's determination.[82] The jury must still make a determination of the amount of damages to be awarded, and the damages cap is applied only in those cases where the jury has made a determination that the damages should be higher than the cap. The law setting a limit on allowable damages does not destroy the jury's role in awarding damages; it merely limits it.

2. **The statutory damages cap on wrongful death recovery is not unconstitutional as applied in this case as a denial of equal protection.**

Brown next argues that even if the damages cap statute is constitutional on its face, it is an unconstitutional denial of equal protection as applied to the facts of this case. Brown claims that the damages cap statute, as applied to multiple statutory dependents, "discriminates irrationally among claimants who have siblings by reducing their recovery in [a] manner that bears no relationship to their actual losses." Brown essentially argues that, because the superior court applied a single damages cap to the aggregate non-economic damages awards of both boys together, each boy recovered half as much as a single surviving decedent would have received in an otherwise identical set of circumstances. Therefore, Brown argues, the brothers were penalized for being siblings.

We take a multi-step, sliding-scale approach to equal protection analysis.[83] First, we determine "the importance of the individual interest impaired by the challenged enactment."[84] Next, we examine "the importance of the state interest underlying the enactment, that is, the purpose of the enactment."[85] The importance we attach to the individual interest dictates the level of importance of the state interest—from mere legitimacy to a compelling interest—that will satisfy equal protection.[86] Finally, we examine "the nexus between the state interest and the state's means of furthering that interest."[87] The importance of the individual interest also controls the required degree of nexus, from substantial relationship to least restrictive means.[88]

In *Evans*, the controlling opinion rejected the plaintiffs' claim that the damages cap impaired their important interest in access to the courts and instead held that the "plaintiffs' interests in unlimited damages are merely economic."[89] In *C.J.*, we

79. *See Kulawik v. ERA Jet Alaska*, 820 P.2d 627, 631 n. 8 (Alaska 1991) (quoting § 353, pt. IV, Carter's Annotated Alaska Code (1900)).

80. *See id.* at 633 n. 14 (quoting ch. 153, § 1, SLA 1955).

81. AS 09.55.580.

82. *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1051 (Alaska 2002).

83. *Wilkerson v. State*, 993 P.2d 1018, 1022–23 (Alaska 1999).

84. *Id.* at 1023 (quoting *State Dep'ts of Transp. & Labor v. Enserch Alaska Constr. Inc.*, 787 P.2d 624, 631–32 (Alaska 1989)).

85. *Id.*

86. *Id.*

87. *Id.*

88. *Id.*

89. 56 P.3d 1046, 1052–53 (Alaska 2002) (citing *Reid v. Williams*, 964 P.2d 453, 458 (Alaska 1998) and *Gilmore v. Alaska Workers' Comp. Bd.*, 882 P.2d 922, 926–27 (Alaska 1994)).

adopted the equal protection analysis of the controlling opinion in *Evans*, holding that "we have consistently held that restrictions on the types or amounts of damages that a plaintiff can pursue in court impair economic interests only."[90] Economic interests receive only minimal protection under equal protection analysis.[91] Under this minimum level of scrutiny the state's objective must be legitimate, and the means for achieving the objective must bear a "fair and substantial" relationship to the accomplishment of the objective.[92]

We held in *C.J.* that the non-economic damages cap survives minimal scrutiny, noting that the court does not require "a perfect fit between a legislative classification and the government objective it is intended to further," and that "although the rationale underlying the legislation should be logically plausible, there is no requirement that it be proved in court."[93] The legislature appears to have intended, in passing the tort reform legislation that included AS 09.17.010, to control "excessive" compensation for tortious injuries,[94] and to reduce the costs of liability and malpractice insurance premiums.[95] The court in *C.J.* concluded that the legislature was entitled to make the conclusions that provided the rationale for passing the legislation, and that "the legislature could reasonably have concluded that any alternative method of lowering insurance costs would have been less fair than a cap on noneconomic damages."[96] The court therefore held that "the damages cap satisfies the means-end fit requirement."[97]

Here, Brown focuses his arguments on the issue of fairness, claiming that an otherwise constitutional cap on recovery "may not be constitutionally applied in situations where there is irrational discrimination among claimants based upon circumstances that bear no relationship to the actual losses sustained by the claimants." To support this argument, Brown cites to *Gilmore v. Alaska Workers' Compensation Board*,[98] where we held that a statute prescribing the wage base on which an injured worker's disability benefits were calculated was unconstitutional as a violation of equal protection because it had the potential to produce substantially different compensation rates for workers who were in important respects similarly situated.[99] We determined in *Gilmore* that the statute at issue was only subject to minimal scrutiny,[100] but that it nevertheless violated equal protection because the benefits levels it produced for injured workers were only randomly related to an injured worker's actual losses. Therefore, did not bear a substantial relationship to the goal of compensating injured workers for their actual losses.[101] In this instance, Brown argues, it is similarly unfair to apply a single cap to the aggregate non-economic damages awards of multiple surviving dependents because each dependent then receives less of the award than would be available to a single surviving dependent in otherwise identical circumstances. Brown asserts that the amount of damages each surviving dependent receives is determined, at least in part, by the number of siblings or other dependents with whom they must split the award, and not by each individual's actual losses.

L.D.G. argues that the application of a single damages cap regardless of the number of surviving dependents is necessary to achieve the legislature's objective of controlling litigation costs and insurance rates.

90. *C.J. v. State, Dep't of Corrs.*, 151 P.3d 373, 379 (Alaska 2006).

91. *Reid v. Williams*, 964 P.2d 453, 458 (Alaska 1998).

92. *Evans*, 56 P.3d at 1053 (citing *Reid*, 964 P.2d at 458 and *Gilmore v. Alaska Workers' Comp. Bd.*, 882 P.2d 922, 926 (Alaska 1994)).

93. 151 P.3d at 380 (internal citations omitted).

94. Ch. 26, § 1(1), SLA 1997.

95. Ch. 26, § 1(3),(5), SLA 1997.

96. *C.J. v. State, Dep't of Corrs.*, 151 P.3d 373, 381(Alaska 2006).

97. *Id.*

98. 882 P.2d 922 (Alaska 1994).

99. *Id.* at 923 (Alaska 1994).

100. *Id.* at 926–27.

101. *Id.* at 928.

L.D.G. asserts that the alternative, damages awards that fluctuate based on the number of beneficiaries, would result in unpredictable, and potentially very large, damages awards that would frustrate the expressed intent of the statute.[102] L.D.G. also responds to Brown's fairness claims by observing that we held in *C.J.* that fairness is not a determinative factor in a minimum scrutiny analysis. We noted in *C.J.* that "we appreciate that there will be severely injured persons who are under-compensated as a result of this legislation, and we are under no illusion that this result will seem fair to them," and that it was not the role of the court to make determinations of "whether damages caps are good policy." [103]

L.D.G.'s assessment is correct. The legislature's approach of imposing a single statutory cap on non-economic damages for all claims arising from a single death bears a fair and substantial relationship to the legislature's legitimate objective of reducing the costs of liability and malpractice insurance premiums. Although the amount of non-economic damages that individual beneficiaries receive may differ depending on the number of other beneficiaries whose claims arise from the same death, the estates themselves are still treated equally. Setting aside the question of whether the damages cap is good policy when applied to multiple claimants, the statutory approach of AS 09.17.010 satisfies the requirements of equal protection.

**3. The trial court did not err in the trial on damages in imposing a single damages cap applicable to all of the decedent's dependents.**

■ After the jury returned its verdict awarding each of Eason's sons $565,798 in non-economic damages, L.D.G. filed a motion requesting the court to apply a single dam-

ages cap of "$400,000 or $8,000 multiplied by the life expectancy of the 'injured party,' whichever is greater" to the entire award. Brown opposed this motion on multiple grounds, including claims that the court must impose a separate cap to the individual award to each boy, and that the appropriate cap was the one million dollar limit for certain personal injury awards. The court found that the damages cap statute did not directly address actions involving multiple claimants, but that when taken as a whole the statute applies a single damages cap "to all claims arising from a single wrongful death, regardless of the number of claimants." The court granted L.D.G.'s motion and entered judgment in the amount of $421,824 ($8,000 multiplied by Eason's life expectancy of 52.728 years) split between the two boys. Brown now asks us to narrowly construe the damages cap statute and to hold that under AS 09.17.020(b) Eason's sons each have a separate claim subject to a separate damages cap. In the alternative, Brown argues that we should hold that the one million dollar damages cap for personal injuries involving "severe permanent physical impairment" under AS 09.17.020(c) applies in this case.

■ We apply our independent judgment when reviewing a trial court's interpretation of a statute, looking to the meaning of the language, the legislative history, and the purpose of the statute, and adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[104] As a threshold issue, Brown argues that the damages cap statute should be narrowly construed because it derogates the common law rule that permits a jury to determine damages unfettered by statutory constraint, subject to judicial review only.[105] L.D.G. argues that we are not required to construe the damages cap

---

102. The related issue of whether the statute actually requires separate damages caps for each beneficiary claimant is discussed in more detail below in part IV.G.3.

103. *C.J. v. State, Dep't of Corrs.*, 151 P.3d 373, 382 (Alaska 2006).

104. *Enders v. Parker*, 66 P.3d 11, 13–14 (Alaska 2003) (internal citations omitted).

105. *See Univ. of Alaska v. Shanti*, 835 P.2d 1225, 1228 n. 5 (Alaska 1992) (noting that "[s]tatutes which establish rights that are in derogation of common law are to be construed in a manner that effects the least change possible in common law").

statute narrowly in this case because the right to recovery for a wrongful death did not exist in the common law and is instead a creature of statute.[106] Brown asserts that although the right to recover damages for the wrongful death of another is of statutory origin, we have previously held in *Loomis Electronic Protection, Inc. v. Schaefer*[107] that the Alaska Constitution's incorporation of the common law right to a jury trial applies to statutorily created causes of action to the same extent as it applies to claims arising under the common law.[108] As discussed above in section IV.G.1, *Loomis* has a narrower holding than that advanced by Brown. In holding that the plaintiffs who brought suit under the statutorily created cause of action for employment discrimination were entitled to a trial by jury, the *Loomis* court held that the legislature had drafted the statute to be "analogous to a number of tort actions recognized at common law" and that therefore the plaintiffs were entitled to recover "the traditional form of relief offered in the courts of law."[109] We did not, therefore, hold that all statutorily created causes of action are entitled to the same guarantees and protections afforded under the common law. Accordingly, we need not narrowly construe the damages cap statute as it is applied to a statutorily created cause of action under the wrongful death statute. However, because the language of the statute and the legislative history at issue in this case are sufficiently clear under any construction, this question of the scope of statutory interpretation is essentially moot.

The non-economic damages statute, AS 09.17.010, reads in pertinent part:

(a) In an action to recover damages for personal injury or wrongful death, all damages claims for noneconomic losses shall be limited to compensation for pain, suffering, inconvenience, physical impairment, disfigurement, loss of enjoyment of life, loss of consortium, and other nonpecuniary damage.

(b) Except as provided under (c) of this section, the damages awarded by a court or a jury under (a) of this section for all claims, including a loss of consortium claim, arising out of a single injury or death may not exceed $400,000 or the injured person's life expectancy in years multiplied by $8,000, whichever is greater.

(c) In an action for personal injury, the damages awarded by a court or jury that are described under (b) of this section may not exceed $1,000,000 or the person's life expectancy in years multiplied by $25,000, whichever is greater, when the damages are awarded for severe permanent physical impairment or severe disfigurement.

Brown argues that the phrase "arising out of a single injury or death" from section (b) should be interpreted as applying not to Eason's death but to the separate claims of each of her two surviving dependents, Justin and Jordan. To support this assertion, Brown notes that every surviving dependent has an individual cause of action for loss of parental consortium,[110] regardless of whether a suit is brought on behalf of the individual dependents by a single personal representative.[111] Brown argues, then, that under the statute Justin and Jordan are each an "injured person," and that therefore a separate damages cap should be applied to each, with the amount of the individual damages cap calculated based on each boy's life expectancy.

L.D.G. responds by arguing that the meaning of the statute is plain and unam-

---

**106.** *See In re Estate of Maldonado,* 117 P.3d 720, 724 (Alaska 2005).

**107.** 549 P.2d 1341 (Alaska 1976).

**108.** *Id.* at 1344 (Alaska 1976) (holding that article I, section 16, of the Alaska Constitution guarantees right to jury trial in action brought under the unlawful employment practices statute, AS 18.80.220).

**109.** *Id.* (quoting *Curtis v. Loether,* 415 U.S. 189, 194–96, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974)).

**110.** *See Truesdell v. Halliburton Co.,* 754 P.2d 236, 237 (Alaska 1988) (recognizing "a minor child's independent cause of action for loss of parental consortium").

**111.** *See In Re Estate of Pushruk,* 562 P.2d 329, 330–31 (Alaska 1977) (noting that in wrongful death action, where decedent survived by statutory beneficiaries, personal representative is nominal party only, and that "the action is brought on behalf of the statutory beneficiary and damages are measured by the loss to the survivors").

biguous on its face and that the cap applies to "all claims" arising out of a "single death," including all wrongful death claims arising from a single death "regardless of the number of children or wrongful death act beneficiaries making claims." L.D.G. further bolsters its argument by pointing to the legislative history behind AS 09.17.010, especially the legislature's intent to address the perceived problems of excessive damages awards and increased costs for malpractice and other liability insurance.[112] L.D.G. points out that the explicit intent of the legislature in imposing the non-economic damages cap on claims arising out of a single death would be frustrated rather than furthered by a construction of the statute that effectively removed the cap in situations where the decedent is survived by many dependents who have suffered non-economic damages as a result of a single death.

The state's brief and the briefs of amicus curiae also dispute Brown's interpretation of the statute. They note that even if each of Eason's surviving dependents has an individual consortium claim, these consortium claims are derivative of a single death.[113] They further point to additional legislative history, quoting Representative Porter's presentation of an overview of the damages cap bill to the Senate Rules Committee and his statement that the versions of the bill from both the finance and rules committees apply the cap "per occurrence."[114]

L.D.G.'s argument that the statute applies a single cap to all consortium claims arising from a single death regardless of the number of claimants is persuasive, particularly in light of the legislative history. The clear language of the statute indicates that a single cap applies to "all claims arising out of a single ... death."[115] There is no modifier of the phrase "all claims." The statute references consortium claims in the same sentence in which it applies the single cap to all claims arising out of a single injury or death.[116] This strongly suggests that the legislature was aware that multiple individuals could have claims arising from a single death or injury, and that the legislature nevertheless intended to apply a single cap to all such claims. Had the legislature intended the meaning advanced by Brown, it would have specified that the cap applied to all claims brought by each claimant. Instead, the legislative history indicates that the legislature intended for the cap to apply to all claims arising from each "occurrence."[117]

Brown argues, in the alternative, that subsection (c)—which provides a cap of $1,000,000 for cases of "severe permanent physical impairment"—should apply in this case.[118] This argument hinges on Brown's assertion that an injury which leads to death is "obviously the ultimate in 'severe permanent physical impairment.'" In his reply brief, Brown identifies what he interprets as an inconsistency between the language of sections (b) and (c). Section (b) provides that the non-economic damages arising out of a single injury or death "may not exceed $400,000 or the injured person's life expectancy in years multiplied by $8,000, whichever is greater."[119] Section (c) provides that the damages in an action for personal injury "may not exceed $1,000,000 or the person's life expectancy in years multiplied by $25,000, whichever is greater, when the damages are awarded for severe permanent physical impairment or severe disfigurement."[120] Brown argues that because section (b)—which applies to both personal inju-

112. *Evans ex rel. Kutch v. State*, 56 P.3d 1046, 1053 (Alaska 2002) (citing to legislative goals for AS 09.17.010 given at ch. 26, § 1(1–5), SLA 1997).

113. *See Chizmar v. Mackie*, 896 P.2d 196, 212 n. 15 (Alaska 1995) (noting that loss of consortium is a derivative claim).

114. Minutes, Senate Rules Comm. Hearing on H.B. 58, No. 075, § 9 (April 15, 1997).

115. AS 09.17.010(b).

116. *Id.*

117. Minutes, Senate Rules Committee Hearing, *supra* note 110 at 46.

118. AS 09.17.010(c).

119. AS 09.17.010(b).

120. AS 09.17.010(c).

ry and wrongful death actions—refers only to "the injured person's life expectancy," the statute implicitly includes deceased persons within the broader category of "injured persons." Brown then argues that if deceased persons and injured persons are treated the same under the statute, and if—as L.D.G. and the state assert—the statute applies only one damages cap to all claims arising from Eason's death, then Eason's death should be considered a personal injury and the greater damages cap under section (c) should apply. Essentially Brown argues that the statute cannot be interpreted in a wrongful death action to both apply one damages cap measured by the life expectancy of the "injured" (i.e. deceased) person, and to exclude deceased persons from the category of injured persons having experienced the most "severe permanent physical impairment."

Brown's logic is not persuasive. It is logically consistent to interpret the statute as applying, under section (b), one cap to claims for damages from most injuries and all deaths, and applying, under section (c), a higher cap to certain injuries with the potential for the most serious, debilitating, and long-term impacts on the injured person. The impact of most injuries on the injured person, and of all deaths on the survivors of the decedent, are no doubt significantly felt in the short term and capable of some lasting effects in the long term. However, while most injured persons and surviving dependents have a strong chance of moving on with their lives in the aftermath of the unfortunate events that give rise to their claims, there are some injured persons whose injuries are so significant that they will permanently and seriously alter the course of the injured person's life. It is these severely injured persons, and not the survivors of a decedent, whom the legislature recognized were in need of the greatest non-economic damages recoveries. This interpretation avoids the logical inconsistencies identified by Brown, but without the strained logic that death is a form of impairment for purposes of calculating damages.

The superior court, therefore, did not err in finding that a single damages cap calculated under section (b) should be applied to the aggregate non-economic damages awarded to both boys in this case. Additionally, the superior court did not err in calculating the size of the damages cap applicable in this case by multiplying Eason's life expectancy (52.728 years) by $8,000 to reach a total cap of $421,824.

## V. CONCLUSION

For the reasons discussed above, we AFFIRM the superior court's decision in all respects with the exception of its dismissal of Larry Gjovig from the lawsuit, and we REMAND for trial of the issue of piercing the corporate veil.

MATTHEWS, Justice, not participating.